**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Garnette WASSON and George Lee**
**Littrell, Defendants-Appellants.**

**No. 76–4503.**

United States Court of Appeals,
Fifth Circuit.

March 6, 1978.

J. David Tracy, Fort Worth, Tex. (Court appointed), for Wasson.

Andrew L. Vogel, Dee Lee Thomas, Jr., Fort Worth, Tex., for Littrell.

Kenneth J. Mighell, U. S. Atty., R. H. Wallace, Jr., Ronald C. H. Eddins, Asst. U. S. Attys., Fort Worth, Tex., Shirley Baccus Lobel, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GOLDBERG, AINSWORTH and FAY, Circuit Judges.

FAY, Circuit Judge:

George Lee Littrell and Garnette Wasson appeal their convictions for knowingly having in their possession Radio Shack electronic calculators valued at more than $100 that had been stolen while being transported in an interstate shipment. 18 U.S.C. § 659. Both appellants were sentenced to two years incarceration with the execution of their sentences suspended and were placed on probation for three years. In addition to the substantive counts, Littrell and Wasson were found guilty by the jury of conspiracy to possess the same Radio Shack calculators. 18 U.S.C. § 371. After the verdict was returned, the trial court granted both appellant's motions for judgment of acquittal on the conspiracy count.[1]

Appellants raise numerous issues on appeal. Of particular importance was whether the trial court should have granted severances from their co-defendants and each other due to misjoinder or, in the alternative, prejudicial joinder. For the following reasons, we reverse the judgments of conviction and remand for separate new trials.

## FACTS

On August 15, 1975, General Instruments of Canada shipped twenty-four cases of electronic calculators from Ontario, Canada, to Radio Shack in Fort Worth, Texas. Each case contained twenty-four calculators. This was the first shipment of this type of calculators to Radio Shack, and each calculator was marked with a particular serial number. Although the exact serial numbers could not be determined, based on production records, an approximate range for the serial numbers was C–100000 to C–101265. Several calculators obtained

---

1. Other defendants on trial with Garnette Wasson and George Littrell were Joseph Kennedy and Steve Burkhart. Co-indictees included Ronald Williams and Joseph Alfred Pina who both plead guilty, after plea bargaining, to one substantive count of possession of goods stolen while being transported interstate. Williams and Pina testified at trial against the other four. Kennedy was convicted on both conspiracy and one substantive count. Burkhart, charged only under the conspiracy count, was granted a judgment of acquittal at the close of the government's case.

from Wasson, Littrell and other defendants were identified by a representative from General Instruments as being part of the August 15th shipment.

Eastern Airlines' records from the Dallas-Fort Worth Regional Airport indicated that the 24 cases were received by Eastern in two separate shipments. Twenty-one cases were received by the airline on August 21, 1975, and were turned over to Regional Air Cargo that day at 2:00 P.M. Because this was not the complete shipment, Eastern prepared a "dummy" air bill to cover it. Eastern's records also reflect that they received the remaining three cases at the same airport and turned them over to Regional Air Cargo for delivery to Radio Shack at 6:30 A.M. the next morning. Signatures on both the "dummy" air bill and the original air bill indicated that all twenty-four cases were delivered to Regional Air Cargo by Eastern.

The terminal manager for Regional testified that Regional normally kept their own records of shipments from the various airlines but that upon searching for them was unable to locate the records for August 21st or 22nd of 1975. He indicated it was easy for the records to be lost, and, therefore, placed no particular significance on their loss.

The delivery of the calculators was made by Clarence Smith, an employee of Regional. He recalled that although both the "dummy" and the original air bill were signed by Radio Shack employees indicating receipt of all twenty-four cases, he did not remember making a delivery of the twenty-one cases to the Radio Shack warehouse but did remember delivering the three cases. Smith also indicated he knew one of the co-defendants, Joseph Weldon Kennedy, and had on occasion visited his place of business, Kennedy Sausage, in Weatherford, Texas.

The receiving clerk at the Radio Shack warehouse, Michael James, testified that his signature was on both air bills, again reflecting receipt of twenty-four cases of calculators on August 22, 1975. However, he also testified that he had no independent recollection of receiving them. On cross-examination by defense counsel, the witness admitted it would be possible for him to sign for portions of shipments not actually received. It was customary, however, when shipments were received at the Radio Shack warehouse that the employees, in addition to signing air bills indicating receipt, would also fill out a daily receiving summary and a daily receiving report both of which would indicate what was actually received through an actual count of the merchandise. This information was later transferred to another report called a "Keyrec" for the computer records. These records of the pertinent dates were introduced at trial, and they indicated Radio Shack received the three cases but not the twenty-one cases of calculators.

David Johnson, office manager of the Radio Shack warehouse, testified that on September 5, 1975, he personally conducted a physical search in the warehouse for the twenty-one cases but was not able to find them. He also indicated that due to security precautions taken by Radio Shack it was extremely unlikely that twenty-one cases of calculators could be removed from inside the warehouse. The cost to Radio Shack of the calculators was established at $25.80 each with a retail price of $59.95 per calculator.

The government's next witness, Gary Reader, testified that he saw Radio Shack calculators of the type introduced at trial at Kennedy Sausage Company in Weatherford, Texas, in August or September, 1975. Reader also testified that he recognized the calculators as those from Radio Shack and subsequently telephoned Charles Tandy, President and Chairman of the Board of the Tandy Corporation which owns Radio Shack, to report what he saw. Tandy's testimony indicated he received a telephone call in September, 1975, which prompted him to contact his security chief with regards to the alleged missing calculators.

Jay Miller, Special Agent with the Federal Bureau of Investigation, learned that appellant Wasson carried Radio Shack calculators at her place of business, the Coloni-

al Steak House, in Weatherford, Texas. Miller went to the Steak House in an undercover capacity on October 22, 1975. There, he observed Radio Shack calculators in a display case near the cash register priced at $19.95. Posing as a traveling salesman, Miller spoke with Wasson who told him the calculators were "a very good deal" because they normally sold for $59.95. Miller asked Wasson where she got the calculator to which she replied that one had to know the right people. She also stated that she had already sold many calculators and she could get more. At the time of this first meeting Wasson sold Miller the two Radio Shack calculators she had in stock and provided Miller with the requested sales receipt showing a price of $19.95 plus $1.00 state sales tax per calculator. Miller also asked if he could purchase thirty more calculators for his boss to distribute as Christmas gifts. Wasson gave Miller her name and telephone number and told him to contact her the next day.

The next morning when Miller contacted Wasson, she told him she could probably have the calculators later that day. He called back later that day and Wasson informed him she only obtained four but could get twenty-six more within a few days. Miller went to the restaurant that day and purchased the four calculators for the same price and again obtained a sales receipt. Wasson also calculated for him the price of the additional twenty-six calculators and gave Miller her calculations. Miller asked if she would take a check but she indicated she would prefer cash.

On October 27, 1975, Miller called Wasson twice and both conversations were recorded and played for the jury at trial. The first, in pertinent part was as follows:

WASSON: Colonial

MILLER: Miss Wasson?

WASSON: Uh huh.

MILLER: This is Jay Miller. How you doing?

WASSON: Fine.

MILLER: Hey, I just came back in through Fort Worth here going over to Dallas.

WASSON: Oh, you . . . Okay.

MILLER: How'd you make out?

WASSON: I've got 17.

MILLER: 17?

WASSON: Uh huh. And think I can have the rest of 'em for you by tomorrow but I'm not sure about it.

MILLER: Okay. Well, listen, will it be all right if I held off till, today being Monday, how about if I came by about Wednesday, would that be all right?

WASSON: Yeah, be fine.

MILLER: Okay.

\*    \*    \*    \*    \*    \*

MILLER: Okay. But you've got 17 now and you think you can get what?

WASSON: I'll get, what is it, what, 9, 9 more?

MILLER: Well, he said get a total of 30 altogether, and we got four so, if you got 26 that would do it.

WASSON: Okay.

MILLER: Listen. Let me ask you this. You got 'em out there now?

WASSON: Yeah. I got 'em right now.

MILLER: Well   .    .

WASSON: Be good if you could get 'em now so I could get a check covered.

MILLER: Well, I could, that's my problem. If you can take a check I can give you a check.

WASSON: What is it, a business check?

MILLER: Yeah. Well, listen, I'll tell you what. Let me, uh what time is it now?

WASSON: It's uh five after eleven.

MILLER: Could I call you back in a little bit and I may be able to just scratch out going to Dallas for a couple of hours and come on over. If not, I'll just wait until Wednesday and come on over and pick up the whole thing and I'll just make it later on in the day.

WASSON: Okay.

MILLER: Is that all right with you?

WASSON: Yes. Just fine.

MILLER: Let me call you back. I'll holler back within 15, 20, 30 minutes.

WASSON: Okay, well, I'll be here.

MILLER: Okey dokey. Thank you.

(TR. 507–509).

The second call, placed within an hour, proceeded, in pertinent part, as follows:

WASSON: Colonial.

MILLER: Garnette?

WASSON: Uh huh.

MILLER: Jay Miller.

WASSON: Uh huh.

MILLER: Hey, would it be okay with you if I came on by on Wednesday. I really, if I don't make, get down the road here a little bit I'm going to have some problems.

WASSON: Yeah. That's be fine.

\* \* \* \* \* \*

MILLER: Yeah. Listen, you're going to have them all in the box again, right?

WASSON: Yeah. Uh huh.

MILLER: Yeah, you know we want, he's going to give them as Christmas presents and he wants the calculators to be boxed so he can just wrap them.

WASSON: Yeah.

MILLER: Is that the way they'll be?

WASSON: Yeah. Uh huh.

MILLER: Okay, well listen. Let me call you Wednesday morning or Wednesday after 1 o'clock. If you don't hear from me right then, don't you go, don't go sellin' 'em on me now.

WASSON: Well, well I wouldn't. I'm not buyin'. I wouldn't buy that many unless I knew that I had a place to sell 'em.

MILLER: Yeah. Well listen, if he wants some more for Christmas presents how many more could you get him?

WASSON: I don't think too many.

MILLER: Not too many more?

WASSON: From all indications. If he does, you need to let me know in a hurry though so I can get whatever I can get.

MILLER: Well, damn, I should have asked him when I talked to him.

WASSON: All I know that's available now is just 12 more.

MILLER: Besides the 17?

WASSON: Beside, no there's another case available besides the 17.

MILLER: Oh, you got one more case available besides the 17.

WASSON: Um hum.

MILLER: Hmm, damn. Could you pick 'em up for me and I'm almost positive he'll take 'em, and I'll pay you cash for 'em then, that way instead.

WASSON: I'd have to have cash.

MILLER: Yeah. But I'd pay you cash for 'em. You can just pick. I just hate not to, you know, get in on 'em while we got 'em.

WASSON: Yeah. Well, it's a good deal.

MILLER: I know. I know. That's what I said, I was amazed 'cause you know

. .

WASSON: Have you compared 'em with other calculators yet?

MILLER: No, why?

WASSON: Well, I just wanted you to know that you did have a good deal.

MILLER: Well, I don't know how you can do it, but that's your business.

WASSON: Well, listen, do you want me to go ahead and get the case?

MILLER: Get the case and he wanted 30, but then he said he'll send 'em out for Christmas presents on his own, too, and uh, you know he's going to give them to the guys at work, but then he'll just use them for his own too, so, well and he could rid of probably ten or twelve more. Well, I've got 4 and that'd make 44. Uh. Could you come up with, could you come up with like maybe 40 altogether.

WASSON: Uh, what's 24 and 17?

MILLER: 24 and 17.

WASSON: Yes, that's how many I can come up with.

MILLER: All right. Uh, that's 41. That's perfect. I'll take 41.

WASSON: Okay.

On October 30, 1975, Miller again met Wasson at the Colonial Steak House and purchased seventeen Radio Shack calculators from her. She again provided him with a receipt for the calculators. Miller

identified at trial both the carton and the calculators he received on this occasion.

On November 6, 1975, Miller called Wasson again and the following conversation took place:

WASSON: Hello.

MILLER: Garnett?

WASSON: Uh huh.

MILLER: Jay Miller. How ya doin?

WASSON: Doin fine.

MILLER: Get any more of those items.

WASSON: No, sure didn't. Hadn't seen anybody.

MILLER: Oh me. Okay. So I guess that's it then huh.

WASSON: As far as I know.

MILLER: Okay. Hey listen. I had a question on one of 'em. One of the darn things doesn't work. Can we just exchange that with you or how do we do it?

WASSON: Well I, all I can do it just give you your money back on it.

MILLER: Can I exchange it at Radio Shack do you think?

WASSON: I don't think so. I don't know.

MILLER: I mean, you know if I just took it down to the store and just told 'em it didn't work would they uh just swap one out?

WASSON: They could possibly.

MILLER: Okay, let me try to do that. All rightie. Uh well. I'm probably going to be coming on through in a couple of days. Maybe I'll stop by and have lunch.

WASSON: All right, do it.

MILLER: All rightie.

WASSON: Okay.

MILLER: Good deal. Listen, sure appreciate everything you did on that.

WASSON: All right.

MILLER: Thank you.

WASSON: Bye. Bye.

Perry Cole, Special Agent with the F.B.I., interviewed Wasson on November 11, 1975. After identifying himself as an agent and advising Wasson of her rights, Wasson told him she had been approached five or six weeks before by an individual she did not know who offered to sell her some Radio Shack calculators. She agreed to purchase twenty for $12.00 apiece. Thereafter she sold the calculators to her customers in the restaurant for $19.95 each plus tax. She also admitted knowing Joe Pina but stated he did not sell her the calculators. Wasson told Cole she purchased a total of forty-one calculators and admitted, upon learning later they were valued at $59.95, that she suspected the calculators were stolen.

Agent Cole then requested permission to search Wasson's home and car which was granted by Wasson. Arrangements were made to conduct the search that afternoon.

When Agent Cole and other agents returned to the restaurant, Wasson indicated she wished to change one part of her story. Everything she told them previously was true except it was Joe Pina who had sold her the calculators. Wasson also provided the agents with a cancelled check payable from the account of Colonial Steak House to Joe Pina in the amount of $120.00, dated September 1, 1975, and signed by Garnette Wasson as payment for the first group of calculators she purchased. The check was endorsed by Joe Pina and then Joseph Weldon Kennedy. The search turned up no other evidence. Wasson then signed a statement for the agents reiterating the above facts.

Another Special Agent for the F.B.I., Fred Daulton, handled the interview with the other appellant, Littrell. This interview took place on the morning of November 11, 1975. Littrell first purchased one Radio Shack calculator from Joe Pina in September, 1975, for $25.00. Later that same month he purchased a total of thirty to fifty more at $12.50 per calculator. Pina, on one occasion, obtained a case of calculators from the trunk of his car to sell to Littrell. The trunk contained several other cases.

For one of his purchases, Littrell paid Pina with a check which was returned by the bank for insufficient funds. Pina then came to see Littrell and collected the money in cash. Littrell tore up the check.

Littrell also revealed to Daulton that Pina had said the calculators were from the factory. Littrell stated he knew that his then girlfriend, Garnette Wasson, had also bought some calculators from Pina during the same period of time.

Several weeks prior to the F.B.I. interview and when Littrell still had five calculators in his possession, he found out the calculators retailed for approximately $65.00. His signed statement read:

About two weeks ago I began to wonder about the calculators, after I saw an ad in the paper showing similar calculators for $65.00.

Littrell sold or gave away most of the calculators he had purchased from Pina. At the time of his interview, however, he returned five of the remaining calculators to the F.B.I. agents.

Co-defendant, Joe Pina, testified for the government during the period he was awaiting sentencing. He testified he purchased the calculators from Kennedy for $10.00 each. Pina asked Kennedy twice if the calculators were stolen and was told they were not. However, Pina was suspicious and felt they might have been stolen. Pina sold an entire case and part of another to Wasson, and he sold part of a case to Littrell. Pina repeated Littrell's story of the bad check, revealed Kennedy had originally cashed it for him, and thereafter went to Littrell to get the money to repay Kennedy when the check was returned.

Pina testified he saw one of the calculators displayed by the cash register in Wasson's restaurant and told her it should not be on display like that. At no time did either Littrell or Wasson question where Pina had obtained the calculators; however, Pina did advise them the calculators retailed for $59.95.

Co-indictee, Ronald Williams, while awaiting sentencing, also testified for the government at the trial. His testimony was mainly concerned with his own purchase of calculators. Williams had never met Wasson until the arraignment in this case and had never discussed this case with Littrell.

Written statements of Burkhart and Kennedy were also put in evidence. Burkhart admitted purchasing a case of calculators from Kennedy but denied knowing they were stolen. Kennedy stated he purchased only twelve calculators for $16.00 each from a black man who came to his place of business. He denied ever reselling a single calculator although he admitted giving them to various employees.

## LITTRELL

George Littrell raises three points of error for consideration by this court. He first contends the trial court should have granted his motion for severance on grounds of misjoinder under Fed.R.Crim.P. 8(b).[2] Littrell argues that Count I of the indictment[3]

---

**2.** (b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

**3.** COUNT I

Beginning in August, 1975, and continuing thereafter up to and including the date of the return of the indictment herein, in Weatherford, Texas, and in the Fort Worth Division of the Northern District of Texas and elsewhere, JOSEPH ALFRED PINA, JOSEPH WELDON KENNEDY, STEVE MITCHELL BURKHART, RONALD RICHARD WILLIAMS, GEORGE

LEE LITTRELL, and GARNETTE WASSON, defendants and co-conspirators herein, knowingly, wilfully, and unlawfully did combine, conspire, confederate and agree together, with each other, and with divers other persons unknown to the Grand Jury, to commit the following offense against the laws of the United States:

To knowingly and wilfully possess goods and chattels of a value in excess of $100.00, that is, Radio Shack electronic calculators, which had been embezzled, stolen, taken and carried away while said property was moving as, was a part of, and constituted an interstate and foreign shipment of freight and express, and the defendants and co-conspirators knew at the time that the said goods and chattels had been embezzled, stolen, taken and carried away; a violation of Title 18, United States Code, Section 659.

does not allege one conspiracy but five distinct and unrelated conspiracies, and, therefore, he was improperly joined with the other defendants pursuant to this court's decision in *United States v. Levine,* 546 F.2d 658 (5th Cir. 1977).

The *Levine* Court provided that "[i]n the absence of an argument of prosecutorial bad faith . . . allegations of an indictment will be accepted as true in deciding a Rule 8(b) motion." Id. at 663. No bad faith has been alleged in our case so we must decide as did the *Levine* Court:

> [W]hether or not the conspiracy count as it stands was sufficient to satisfy rule 8(b)'s requirement that the defendants 'have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.' [Citations omitted]

*Id.* at 664.

We find that it was sufficient. In *Levine,* the court found the face of the conspiracy count clearly pointed to the existence of two separate conspiracies with a common defendant. The government's support for charging only one conspiracy was "the false legal premise that proof of proximate or simultaneous conspiracies with one common conspirator was sufficient to establish the existence of a single conspiracy." Id. at 665. There is no such reliance by the government here. The government believed it could prove the existence of a single conspiracy wherein the six defendants charged conspired to acquire and possess stolen calculators with the intention to resell for profit.

Littrell argued to the court on his motion for severance that the evidence was not sufficient to connect the "spokes" of this alleged "wheel" conspiracy. His argument was only factual in nature. A claim of misjoinder under Rule 8 is reviewable on appeal as a question of law. *United States v. Levine,* 546 F.2d 658, 661 (5th Cir. 1977); *United States v. Park,* 531 F.2d 754, 760 (5th Cir. 1976); *United States v. Marion-*

---

It was a part of the conspiracy that the defendants would acquire and possess the said stolen calculators for personal use and for resale and profit.

OVERT ACTS

It was in furtherance of the conspiracy and to effect the objects thereof that the defendants and co-conspirators performed the following overt acts:

1. On or about August 21, 1975, a person or persons embezzled, stole, took and carried away twenty-one (21) cases consisting of 504 Radio Shack electronic calculators, which calculators had been transported from Ontario, Canada, to the Northern District of Texas.

2. On or about August 24, 1975, JOSEPH ALFRED PINA purchased approximately one (1) case consisting of 24 stolen Radio Shack electronic calculators at the Kennedy Sausage Company in Weatherford, Texas.

3. On or about August 29, 1975, JOSEPH WELDON KENNEDY sold to STEVE MITCHELL BURKHART one (1) case consisting of 24 stolen Radio Shack electronic calculators which BURKHART purchased from KENNEDY for $384.00 at the Kennedy Sausage Company.

4. During the last of August and the month of September of 1975, KENNEDY distributed about ½ case consisting of 12 stolen Radio Shack electronic calculators to his employees at the Kennedy Sausage Company in Weatherford, Texas.

5. On or about August 29 and September 5, 1975, JOSEPH ALFRED PINA purchased a total of about four (4) cases consisting of 106 stolen Radio Shack electronic calculators at the Kennedy Sausage Company in Weatherford, Texas.

6. On or about September 1, 1975, PINA sold about ten (10) stolen Radio Shack electronic calculators to GARNETTE WASSON at the Colonial Steakhouse in Weatherford, Texas, and WASSON paid PINA $120.00 for the calculators.

7. On or about October 30, 1975, GARNETTE WASSON purchased approximately 17 stolen Radio Shack electronic calculators from PINA and thereafter sold them to Jay Miller in Weatherford, Texas.

8. On or about September 8, 1975, RONALD RICHARD WILLIAMS gave PINA a check for $280.00 in payment for a quantity of stolen Radio Shack electronic calculators.

9. On or about October 6, 1975, WILLIAMS gave PINA a check for $130.00 in payment for a quantity of stolen Radio Shack electronic calculators.

10. On or about October 11, 1975, WILLIAMS gave PINA a check for $288.00 in payment for a quantity of stolen Radio Shack electronic calculators.

11. During September and October of 1975, PINA sold approximately 40 stolen Radio Shack electronic calculators to GEORGE LEE LITTRELL and LITTRELL sold a portion of these calculators to a friend.

A violation of Title 18, United States Code, Section 371.

*neaux*, 514 F.2d 1244, 1248 (5th Cir. 1975); *Tillman v. United States*, 406 F.2d 930, 933 n. 5 (5th Cir. 1969), *vacated on other grounds*, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742. Although the trial court's subsequent granting of the motion for judgment of acquittal on the conspiracy count indicates that on the facts Littrell was correct, it does not support the issue of an improper legal interpretation of conspiracy law.

Since we find that joinder was authorized under Rule 8(b), we now must consider Littrell's assignment of error to the trial court's denial of his motion for severance which raised the existence of prejudice during trial under Fed.R.Crim.P. 14.[4]

The Supreme Court in *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), stated:

> We do emphasize, however, that . . . the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear. And where, as here, the charge which originally justified joinder turns out to lack the support of sufficient evidence, a trial judge should be particularly sensitive to the possibility of such prejudice.

Id. at 516, 80 S.Ct. at 948. *See also United States v. Clark*, 480 F.2d 1249, 1252 (5th Cir. 1973).

■ The weighing of the prejudice shown against the interests of judicial economy is committed to the sound discretion of the trial judge and an appellate court will not substitute its own judgment for that of the trial judge without an affirmative showing that the trial court abused its discretion. *United States v. McLaurin*, 557 F.2d 1064, 1074–1075 (5th Cir. 1977).

■ The existence of prejudice turns upon the facts of each case and the test this court uses states:

[W]hether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted. *Tillman v. United States*, 406 F.2d 930, 935 (5th Cir. 1969), *vacated in part* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). In *Tillman* this court also stated:

> In determining on appeal whether the jury was in fact confused, the court will look to the verdict. Convictions will invariably be sustained if it may be inferred from the verdict that the jury 'meticulously sifted the evidence', as where it acquits on certain counts.

406 F.2d at 936, *citing* 8 Moore, Federal Practice ¶ 14.04[1], p. 19 (2d ed. 1977).

■ Here, the government stated in its closing argument:

> As regard the conspiracy, ladies and gentlemen, I submit to you that the facts and evidence show that the conspiracy existed between Joe Pina and Weldon Kennedy and that the conspiracy did *not* exist between Littrell and Wasson. [Emphasis added]

(TR. 865). The jury thereafter found Kennedy, Wasson and Littrell guilty of conspiracy.

The government's statements alone indicate that they did not prove Littrell was part of the conspiracy. The jury's action in convicting Littrell makes it apparent that the jury was confused, and that this confusion was prejudicial to Littrell's case.

---

**4.** Rule 14. Relief from Prejudicial Joinder

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

However, the trial court then granted Littrell's motion for judgment of acquittal as to the conspiracy count. This action by the trial court remedied the prejudice which was caused by trial with defendants whose guilt was supported by substantial evidence, but we must now decide whether that prejudice spilled over into the jury's consideration of the substantive count charged against Littrell. In this case, we are not prepared to say that Littrell was not prejudiced. Although the evidence was sufficient to support the verdict on the substantive count, it was not so overwhelming that the obvious guilt of Kennedy did not tip the scales against Littrell. Therefore, we find the trial court abused its discretion in failing to grant a severance, and we remand this case to the trial court for a new trial.

Littrell's last point on appeal was based on an alleged comment by the government in closing argument on Kennedy's failure to testify which in turn was prejudicial to him. Although we doubt this comment had such an effect, because we are remanding for a new trial where it is unlikely to recur, we find it unnecessary to discuss this point.

## WASSON

Wasson raises on appeal, as did Littrell, the failure of the trial court to grant a severance pursuant to Rules 8(b) or 14 of the Federal Rules of Criminal Procedure. Wasson claims that although she did not file her own motion prior to or during the trial, she was joined by the court in Littrell's motion for severance. As an alternative, she suggests that even if the court finds she did not join in Littrell's motion, there was sufficient cause to find relief from waiver under Fed.R.Crim.P. 12(f).[5]

Upon reviewing the record where Wasson claims the trial judge joined her in the motion of Littrell, we conclude the judge was clearly referring to the motions for judgment of acquittal filed at the close of the government's case in chief, not Littrell's

pretrial motion for severance. Wasson, therefore, was not joined in the motion.

■ Next, we consider defendant Wasson's alternative argument. For the reasons discussed above with respect to Littrell, we found prejudice existed arising from the trial court's failure to sever his case from that of the other defendants. That same prejudice existed for Wasson. This Circuit has held where a defendant does "not either before or during trial move for a severance, to prevail on this issue now, [he] must demonstrate actual prejudice resulting from the failure to sever his trial from that of his co-defendant[s]." *United States v. Washington*, 550 F.2d 320, 328 (5th Cir. 1977).

Under the circumstances of this case, co-defendant Littrell brought to the trial court's attention the possibility of prejudice by his motion for severance and the trial court denied that motion as it would have Wasson's. Because the trial court has a continuing duty to be on the lookout for possible prejudice, and the jury's verdict in this case made the existence of actual prejudice apparent, we find that in the interests of justice, Wasson's judgment of conviction should be reversed and her case remanded for a new trial.

Again, because we are returning her case to the district court for a new trial, we find it unnecessary to consider Wasson's fourth argument that she was prejudiced by certain actions of the government's attorney. It is extremely unlikely this alleged error will recur during a new trial.

■ Finally, Wasson suggests there was insufficient evidence to sustain her conviction. In evaluating the evidence, we have viewed it in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and find that there was sufficient

---

**5.** (f) Effect of Failure to Raise Defenses or Objections. Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to subdivision (c), or prior to any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

evidence to support a conviction.[6] However, in reversing her conviction for prejudicial joinder (as well as Littrell's) we do not foreclose the possibility that a non-prejudiced jury may take a different view of the evidence.

For the foregoing reasons, we reverse the judgments of conviction and remand them for separate new trials.

---

**6.** In particular there is no doubt the government proved and the jury believed the "interstate" character of the stolen calculators.