**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Conrado CABALLERO, Juan H. Rodriguez, Daniel Gonzalez and Juan Caceres, Defendants-Appellants.**

No. 82–2027.

United States Court of Appeals,
Fifth Circuit.

Aug. 3, 1983.

Rehearings Denied Sept. 23, 1983.

Windi Akins, Houston, Tex. (Court-appointed), for Caceres.

H. Frank Rubio, Miami, Fla., for Caballero.

Stephen H. Rosen, Paul Morris, Miami, Fla., for Rodriguez & Gonzalez.

James R. Gough, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before GARZA, RANDALL and GARWOOD, Circuit Judges.

GARZA, Circuit Judge:

Defendants assert in this appeal that their convictions must be reversed (1) because the evidence is insufficient to support their convictions; (2) because the inflamma-

tory remarks of the Assistant United States Attorney in the closing argument require a mistrial; and (3) because the court erred in admitting certain co-conspiratorial statements without the benefit of a *James* hearing. After thoroughly reviewing the record, we affirm the convictions of all four defendants for the reasons specified below.

## FACTS

The charges against defendants arose from a Drug Enforcement Administration (DEA) investigation into the suspected narcotics operations of David Punch. That investigation was conducted primarily by one DEA agent, Paul Herring, who posed as an individual involved in the business of importing and storing marihuana. Herring was assisted in his investigation by a number of DEA agents, including Agent Arturo Ramirez, who entered the investigation in late February and was present during the negotiations of the specific transaction for which defendants were indicted.

Agent Herring was introduced to Punch by a DEA informer in October of 1980. Over the course of the next few months, the two had numerous discussions about narcotics operations. For much of the fall, they negotiated the purchase by Herring of ten tons of marihuana. Government seizure in December of the vessel carrying the marihuana eliminated the possibility of that sale. In February, Agent Herring accompanied Punch to Florida for a meeting with his contacts in the smuggling business. This led to renewed negotiations about the importation of a large amount of marihuana. In discussions, Herring had let it be known that he was interested in not only the importation and storage facets of the smuggling operation but also the direct sale aspect of the venture. He told Punch that he had contacts in Denver who could sell the marihuana. Punch again responded to this expressed interest on March 4, 1981, when he mentioned to the agents that he knew someone interested in selling 15,000 pounds of marihuana. The agents expressed interest and generally discussed the idea with Punch for two weeks. These

discussions solidified on March 19 when the agents met with Punch at his Galveston home. At that meeting, the agents met Ezell Minton who told them that he had 15,000 pounds of marihuana stored in a warehouse located between Galveston and Houston. The agents told Minton that they were interested in purchasing the drugs but that before they could agree about a price they needed to inspect the marihuana. Minton did produce a two-pound sample, and the agents made an offer to purchase the marihuana, conditioned upon their ability to inspect the product.

The next day, the same parties held another meeting for the purpose of discussing specifics of the sale. Ezell Minton left for a short while during the meeting and returned with defendant Juan Caceres. Later, the agents again insisted on inspecting the marihuana; Caceres explained that this would have to be done in Houston. The five left Punch's home and proceeded to the Candlelight Lounge. Caceres arrived twenty-five minutes after the rest of the group. The ensuing discussion included talk about who would bear the loss in case of government interference with the smuggling operation. Minton and Caceres agreed to bear one-half of the loss, and Herring agreed to absorb the other half.

When Caceres informed the group that his associates had arrived, Herring suggested that Ramirez go to inspect the marihuana. This was consistent with Ramirez' role as one of Herring's assistants. All parties agreed that Ramirez should go with two other persons. Ramirez then left the lounge with Caceres, who introduced him to defendants Daniel Gonzalez and Conrado Caballero and told the agent that the two had a financial interest in the marihuana. Gonzalez questioned Ramirez about his ability to purchase such a large amount of marihuana; Caceres immediately assured Gonzalez and Caballero that the two had sufficient funds.

After this brief exchange, Gonzalez told Caballero to go get the men who were to accompany Ramirez to the warehouse. Ramirez interjected that he could only fit one

other person in his small car. Caballero returned from the lounge with defendant Juan Rodriguez. The inspection tour was now set to begin, and Caballero reminded Gonzalez that Rodriguez needed the keys. Gonzalez fished the keys from his pocket and handed them to Caballero who, in turn, handed them to Rodriguez. Caballero also gave Rodriguez a brown paper bag.

Rodriguez and Ramirez proceeded to the warehouse which was located about 10–12 miles from the lounge. They went to the office where Ramirez was introduced to Larry Smith. Smith agreed that they could see the marihuana. Inside the warehouse was a yellow van container which Rodriguez unlocked to reveal between 10,000–15,000 pounds of marihuana. Ramirez examined the marihuana briefly and then the two returned to the Candlelight Lounge. They found Gonzalez and Caballero waiting for them outside the lounge. Caballero asked if the marihuana was satisfactory. Gonzalez said that he had spoken with someone at the warehouse who had assured him that it would remain open until Ramirez finished loading the marihuana. Ramirez stepped inside the lounge for a moment and indicated to Herring that he had seen the marihuana. Herring made the necessary phone call, and defendants were arrested shortly thereafter.

## SUFFICIENCY OF THE EVIDENCE

[1] Defendants contend that the government presented insufficient evidence to support their convictions for possession with intent to distribute marihuana in violation of 21 U.S.C. § 841(a)(1). Since the involvement of these four defendants was revealed on the very day they were arrested, they attempt to downplay the roles which they played. They point out that mere presence or association with those who do control the drug is insufficient to support a conviction for possession of marihuana. *United States v. Ferg,* 504 F.2d 914, 916–17 (5th Cir.1974); *United States v. Stephenson,* 474 F.2d 1353, 1355 (5th Cir.1973). We certainly do not take issue with this principle but simply proceed to examine the evidence in order to determine the extent of defendants' involvement in the charged criminal activity.

The standard of review in a criminal case where the issue of sufficiency is presented is whether a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *United States v. Thompson,* 700 F.2d 944 (5th Cir.1983). In applying that standard, we must consider the evidence and all reasonable inferences therefrom in a light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

The government asserts that the evidence of constructive possession presented in the court below is sufficient to sustain the convictions. Possession may be constructive as well as actual and may be joint among several defendants. *United States v. Vergara,* 687 F.2d 57, 61 (5th Cir.1983). Constructive possession may be proved by "ownership, dominion or control over the contraband itself, or dominion or control over the premises or vehicle in which the contraband was concealed." *United States v. Salinas-Salinas,* 555 F.2d 470, 473 (5th Cir.1977). In *United States v. Martinez,* 588 F.2d 495 (5th Cir.1979), this Court noted that "[i]n essence, constructive possession is the ability to reduce an object to actual possession." 588 F.2d at 498.

There is ample evidence of constructive possession to support each defendant's conviction. Defendant Gonzalez had the keys to the vanload of marihuana when Agent Ramirez met him.[1] This clearly gave

---

1. Gonzalez asserts that there is no evidence which demonstrates that the keys he possessed were the keys to the van containing the marihuana. He contends they may have been keys to a motel room instead. For this reason, he submits that possession of these keys cannot link him to the drugs. This is untrue. Agent Ramirez testified that immediately before going to see the marihuana, Rodriguez was given a set of keys by Gonzalez. Rodriguez used a set of keys to open the container of marihuana. The jury was clearly entitled to draw the reasonable inference from the timing of the keys transfer and their immediate use. Further-

him dominion and control over the marihuana. His participation in discussions about the marihuana shows his knowledge about the whereabouts of the drugs. Defendant Juan Rodriguez took this ability to have dominion and control over the marihuana one step further when he used the keys to open the van containing the controlled substance. He obviously did have actual possession of the marihuana.

■ Defendant Caballero, who reminded Gonzalez to give the keys to Rodriguez, only held the keys briefly as he passed them between the two defendants. His comment about the keys indicates, however, both knowledge of and an ability to obtain dominion and control over the substance. In addition, defendant Caceres introduced both Gonzalez and Caballero to Agent Ramirez as individuals who had a financial interest in the transaction.[2] Viewing these two remarks in the light most favorable to the prosecution, we must conclude that the jury possessed sufficient evidence to find that Caballero constructively possessed the marihuana.

Defendant Caceres is the only one of the four defendants whom the agents did not see in possession of the keys. The evidence adduced at trial about his role, however, leads to only one possible conclusion: Caceres was properly convicted of possession of marihuana. At the March 20 meeting where he met Agents Herring and Ramirez, Caceres immediately asked for a clarification of the financial terms of the marihuana sale.[3] When Agent Herring expressed his concern about the quality of the marihuana, Caceres assured him that the marihuana was not wet. He also stated that he had made arrangements for the agent to inspect

the marihuana that afternoon but that this would have to take place before 3:00 p.m. When the meeting moved to the Candlelight Lounge, Caceres went to inform some of his associates of the meeting place.

Caceres arrived at the lounge about 25 minutes later than the rest of the group. In the discussion that ensued, Caceres agreed to take one-fourth of the loss in the event the marihuana was seized. This demonstrates once again his financial interest in the marihuana. Caceres also stated his desire to place two of his people on the trucks that would transport the marihuana to Denver, where Herring claimed it would be sold. About ten minutes later, Caceres informed Herring that his people had arrived. He excused himself from the rest of the group to talk to these individuals. When he returned, he said that arrangements had been made for Herring to inspect the marihuana. Herring indicated that he would send his assistant, Agent Ramirez, to perform that task. Caceres then accompanied Ramirez outside of the lounge, where the agent was introduced to Caballero and Gonzalez. Finally, after the inspection was completed, Caceres acted as a spokesman for Gonzalez, Rodriguez, and Caballero when he questioned Herring about when they would receive the million dollar payment for the marihuana.

■ The above-mentioned conversations indicate not only Caceres' financial interest in the marihuana and knowledge of its storage location, but most importantly his ability to direct others to take Ramirez to the storage facility. Since the very essence of constructive possession is the ability to reduce the marihuana to actual possession,

more, Agent Ramirez implied that the keys given to Rodriguez were the same keys used to open the van. The jury is the final arbiter of credibility. *United States v. Parr,* 516 F.2d 458 (5th Cir.1975).

**2.** Gonzalez contends that this statement must be excluded as inadmissible hearsay. Federal Rule of Evidence 801 provides, however, that a statement is not hearsay when it is offered against a party who has manifested his belief in its truth. The very nature of this comment which was made when the parties were in close

proximity and Gonzalez' ensuing silence establishes his concurrence in its content.

**3.** Counsel for Caceres claimed at oral argument of this case that defendant only attended the March 20 meeting at David Punch's home in order to serve as a translator for Ezell Minton. Not only was there no language barrier between the participants that required bridging, but also the record reveals that Caceres took a very active role at the meeting.

the power to direct his assistants to show Ramirez the marihuana demonstrates the consequent power to exercise dominion and control over the marihuana personally. *See United States v. Moreno,* 649 F.2d 309 (5th Cir.1981), where this Court held that "physical custody of narcotics by an employee or agent whom one dominates, or whose actions one can control, is sufficient to constitute constructive possession by the principal." 649 F.2d at 313.

■ Defendant Gonzalez makes a second insufficiency claim when he contends that possession of the keys is not tantamount to proof that he had the ability to control the marihuana *as well as the requisite intent to distribute it.* The Circuit rule that intent to distribute may be inferred from the possession of a large quantity of drugs, *United States v. Vergara,* 687 F.2d at 62, compels us to reject this argument. The jury may also infer intent to distribute from evidence of the price of the marihuana. *United States v. Sheikh,* 654 F.2d 1057, 1067 (5th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982). We will not disturb the jury verdict on the possession count.

■ At oral argument of this case, counsel for defendant Caceres asked us to reverse her client's conviction because of the district court's failure to give an aiding and abetting charge, claiming that there was no evidence that could connect her client to an offense of possession of marihuana with intent to distribute. Our findings on the sufficiency issue, however, clearly connect Caceres and all other defendants to the marihuana by either actual or constructive possession. Contrary to counsel's characterization of the evidence, the defendants were not merely aiders and abettors, but they actually possessed the marihuana with intent to distribute. The failure to give the aiding and abetting charge was thus no error at all in the instant case.

## PROSECUTOR'S CLOSING ARGUMENT

Defendants strongly challenge the propriety of the prosecutor's closing argument which, in their estimation, went far beyond a mere appeal for good law enforcement. They characterize the argument as designed to instill in the minds of the jury that they should ignore the principles of burden of proof, reasonable doubt, and other instructions of the court in order to rid the country of this evil menace. The challenged portions of that statement are reproduced below.

The only thing I ask you to do, ladies and gentlemen, is in this one day of your life, on this good Saturday, in November, in 1981, that you have the courage to go out there and come back and say to these guys they are guilty. I ask you to have that courage because it is not easy to ever find anybody guilty. But one thing I have never told you in this trial was that it was going to be easy. But please have the courage to go out there and find these Defendants guilty and come back and return guilty verdicts, because we need juries like yourselves that have the courage to do that. Because if we don't, I fear what is going to happen. Believe me, your verdict goes out, the word goes out. And by your verdict you say something to people like these Defendants and other people of a like mind as these Defendants who see a big, quick and easy profit from Marijuana. (CA. T. 129).

\* \* \* \* \* \*

*I asked you to go out there, ladies and gentlemen, and find them guilty for the simple—one reason, not for me and not for Mr. Berry, but to find them guilty because they are guilty.* That's the only reason. Because I have to live here and the twelve of you have to live here and you today, more than any other time, more than when you go into a polling booth to vote along with twenty million other people, today there is only twelve of you. And every vote counts. But you have the chance today to say something about what kind of county we are going to have here in Texas and what kind of society we are going to live and bring our children up in. You say something very definite about that today. And please,

would you say something to these people so the word will go back to Florida, so their friends, would you please say you are not going to tolerate it, you are not going to tolerate all the evil things that come from 22,000 pounds. I had confidence in you on Monday, I have confidence in you now. Please have the courage, members of the jury, to do what is right, to find each and every one of them guilty. Go out and have a nice lunch and come back and find them guilty. And I will be the first to shake your hand when this is over. Thank you very much. (CA. T. 130–131) (emphasis added).

■■■■ A fair reading of the closing argument confirms the accuracy of the district judge's ruling that the prosecutor made a vigorous, but permissible, plea for law enforcement. The offense charged is a major transaction, and the government committed no error in characterizing it as such.

■■■■ Defendants also contend that the italicized remarks constitute an improper comment by the prosecution that he personally believed the defendants to be guilty. We disagree. The prosecutor clearly asked the jury to return guilty verdicts because the evidence so required. In fact, he specifically cautioned the jury not to take such action simply because they felt he or his associate wanted them to do so.

■■■■ Finally, defendants assert that the prosecutor's remark about sending the word back to Florida indirectly infers that defendants are involved in organized crime. We must again disagree with defendants' interpretation of the closing argument. The statement is nothing more than a reference to David Punch's Florida contacts who were mentioned throughout the trial of this case. It is hardly an attempt to bring before the jury evidence which had not been presented at trial.

## GUILT BY ASSOCIATION?

Finally, the defendants assign as error the court's failure to grant their motions for severance and a pretrial *James* hearing.

They contend that the judge's refusal to grant severance resulted in conviction based solely on their association with David Punch. In ruling on the propriety of the court's action, we follow the dictates of *United States v. Zicree,* 605 F.2d 1381 (5th Cir.1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980), wherein it was held:

In order to obtain severance under Rule 14, the defendants have the difficult burden of proving that they will suffer the most compelling prejudice from continued joinder; a mere showing of some prejudice is insufficient. [*United States v.*] *Perez,* 489 F.2d [51] at 65 [ (5th Cir. 1973) ]. The test for such prejudice is

[W]hether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.

\* \* \* \* \* \*

*In determining on appeal whether the jury was in fact confused, the court will look to the verdict. Convictions will invariably be sustained if it may be inferred from the verdict that the jury "meticulously sifted the evidence," as where it acquits on certain counts.* United States v. Wasson, 568 F.2d 1214, 1222 (5 Cir.1978), *quoting Tillman v. United States,* 406 F.2d 930, 935–36 (5 Cir.), *vacated in part on other grounds,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).

605 F.2d 1388–89 (emphasis added).

■■■■ The jurors certainly demonstrated their capacity to sift through the evidence when they convicted defendants of possession but acquitted them of conspiracy. Defendants fail to specify evidence of preju-

dice which would necessitate an order of severance.

The other portion of defendants' attack on a verdict solely based, in their estimation, upon guilt by association is a challenge to the court's failure to hold a pretrial *James* hearing. *United States v. James,* 590 F.2d 575 (5th Cir.1978) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), however, does not require such a hearing. Rather, the case simply recommends this procedure but provides that

> [r]egardless of whether the proof has been made in the preferred order, or the coconspirator's statement has been admitted subject to later connection, on appropriate motion at the conclusion of all the evidence the court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy. Rule 801(d)(2)(E).

590 F.2d at 582.

■ After trial, the district court ruled that only certain statements by Punch about Caceres were even entitled to a *James* hearing. The court also held that the prosecution had borne its burden of proof under *James* and the statements were, therefore, properly admitted. The court committed no error in so ruling.[4] The court had previously instructed the jury that the conversations between Punch and the DEA agents were admitted only against Punch.

For the above-stated reasons, the defendants' convictions are affirmed.

AFFIRMED.

---

**4.** Although this challenge is couched in terms of objecting to the admission of evidence pursuant to the co-conspiratorial exception of Federal Rule of Evidence 801(d)(2)(E), defendants actually contend that the admission of all discussions between Punch and DEA agents prior to March 20 prejudiced them by painting Punch as a big-time drug dealer and making them appear guilty by association. That argument was addressed in this court's discussion of the severance issue.