**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jo Ann HARRELSON, Charles Voyed Harrelson and Elizabeth Nichols Chagra, Defendants-Appellants.**

No. 83–1199.

United States Court of Appeals,
Fifth Circuit.

Feb. 15, 1985.

1154

Charles Campion, San Antonio, Tex., for J. Harrelson.

Thomas G. Sharpe, Jr., Brownsville, Tex., for C. Harrelson.

Charles V. Harrelson, pro se.

Warren Burnett, Larry Zinn, Galveston, Tex., for E. Chagra.

Edward C. Prado, U.S. Atty., LeRoy Morgan Jahn, Asst. U.S. Atty., San Antonio, Tex., for the U.S.

Before GEE, REAVLEY and DAVIS, Circuit Judges.

GEE, Circuit Judge:

This appeal draws before us, on a massive record, the claims for reversal by three appellants of their convictions of felony arising from the murder of United States District Judge John Wood. Several points are common to all appeals and are jointly briefed; others are peculiar to each of the several appeals. We commence our discussion with the former. Before doing so, however, a brief and general statement of background facts is appropriate; others will be noted where material to particular contentions made.

*Factual Background*

In late May of 1979, Judge Wood was instantly killed by a dumdum bullet fired into his back from a six millimeter rifle capable of extremely high velocity. He was shot while entering his automobile at his townhouse residence in north San Antonio, preparatory to driving to work at the courthouse downtown. Witnesses placed appellant Charles Harrelson at the townhouse complex that morning; further investigation indicated that Judge Wood's murder by Harrelson was arranged by appellant Jamiel Chagra, a gambler and narcotics dealer under indictment for drug offenses, who was to be tried before Judge Wood and who feared his reputation for imposing severe sentences in drug cases.

Other evidence, construed favorably to the guilty verdicts, implicated Chagra's brother Joseph, then a licensed attorney, in the plot. Joseph Chagra turned state's evidence and testified against the present appellants, though not against his brother. Also implicated by Joseph's testimony and other evidence were Jamiel Chagra's wife, Elizabeth, as well as Harrelson's wife, Jo Ann, who procured the murder weapon and assisted in its disposition. Implicated as well was Teresa Starr, the daughter of Jo Ann Harrelson, who traveled to Las Vegas—then the residence of the Chagra appellants—and took delivery of the blood money from Elizabeth Chagra. After initial recalcitrance, Starr also turned state's evidence.

Charles Harrelson, the Chagras, and brother Joseph were charged with conspiring to murder Judge Wood on account of the performance of his duties. 18 United States Code § 1117. Harrelson and Jamiel Chagra were charged with the murder itself, in violation of 18 United States Code §§ 1111 and 1114. All were charged with conspiracy to obstruct justice in violation of 18 United States Code §§ 371 and 1503. The Chagra males were also charged with conspiring to possess a large quantity of marijuana, in violation of 21 United States Code § 841(a)(1). Elizabeth Chagra and

the Harrelsons were tried together and convicted on all charges. This is their appeal from those convictions.

Jamiel Chagra was separately tried and convicted of conspiracy to obstruct justice and the drug charge, but acquitted of the murder and conspiracy to murder.[1] Jo Ann Harrelson was separately tried on related perjury charges. *United States v. Harrelson*, 754 F.2d 1182 (5th Cir.1985). Jamiel and Elizabeth Chagra were separately convicted of criminal tax charges. *United States v. Chagra*, 754 F.2d 1181 (5th Cir. 1985). We affirm these convictions in separate opinions today. We likewise affirm all convictions on the instant appeal save that of Elizabeth Chagra for conspiracy to murder in violation of 18 United States Code § 1117, which we reverse for reasons to be assigned.

*Joint Contentions*

1. *Denial of Venue Change*

■ Among the contentions common to all three appeals and jointly briefed is a complaint that the trial court abused its discretion in denying a change of venue sought on the basis of prejudicial pretrial publicity. Such a change is required "if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial...." Fed.R.Crim.P. Rule 21. As the words of the rule imply, that decision is one committed to the sound discretion of the trial court. *United States v. Nix*, 465 F.2d 90 (5th Cir.), *cert. denied*, 409 U.S. 1013, 93 S.Ct. 455, 34 L.Ed.2d 307 (1972). Much has already been written on this subject, both by the Supreme Court and by us,[2] the principles governing such decisions are well settled, and there is scant need for us to address the subject generally or to approach it along the avenue of first princi-

ples. We therefore turn directly to the appellants' specific claims of error.

A. Community Saturation

Appellants first contend that prejudicial pretrial publicity so saturated the venire from which came their jurors as to preclude the empanelling of an impartial jury, seeking to draw their situation within the ambit of such decisions as *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (half of Louisiana parish from which venire was drawn had viewed defendant's televised confession to brutal crime).

We have recently had occasion to address such a contention in a case connected to this one:

> [A]n appellant can demonstrate that prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury. *Murphy v. Florida, supra*, 421 U.S. at 798–99, 95 S.Ct. at 2035–36; *Mayola v. Alabama, supra*, 623 F.2d [992] at 996–97 [5th Cir.1980]. Proof of such poisonous publicity raises a presumption that appellant's jury was prejudiced, relieving him of the obligation to establish actual prejudice by a juror in his case. *Mayola v. Alabama, supra*, 623 F.2d at 997. This presumption is rebuttable, however, and the government may demonstrate from the *voir dire* that an impartial jury was actually impanelled in appellant's case. *Id.* at 1000–01. If the government succeeds in doing so, the conviction will stand despite appellant's showing of adverse pretrial publicity. *Id.* at 1001.

*United States v. Chagra*, 669 F.2d 241, 250 (5th Cir.), *cert. denied*, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982).

---

1. *United States v. Chagra*, 754 F.2d 1181 (5th Cir.1985). One may speculate that this resulted from the absence of his brother Joseph as a witness.

2. See, e.g., *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Rideau v.* *Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *United States v. Chagra*, 669 F.2d 241 (5th Cir.), *cert. denied*, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982), and *United States v. Herring*, 568 F.2d 1099 (5th Cir.1978).

■ Assuming, as we do for purposes of analysis, that such community saturation existed here, we have carefully examined the voir dire conducted by the court of the twelve jurors and two alternates. The examination of the venire was searching and sensitive, covering seven court days and more than two thousand pages of transcript. In its course, the court thoroughly and correctly instructed the prospective jurors on their responsibilities should they be selected as jurors and inquired of each, on an individual basis, whether any pretrial publicity had come to his attention and its specific source. Additional and separate, individual inquiries concerned whether the venireman had formed any opinions regarding the guilt or innocence of any appellant, whether any verdict that he might return would be based solely on what he heard in court, whether he had any prior connection with federal court or the criminal law, and the like. Counsel frequently posed additional inquiries through the court.

Some of those who were seated on the jury had little or no prior knowledge of the case.[3] Others indicated a casual acquaintance with publicity in the case.[4] None had

---

3. One testified regarding her knowledge as follows:

> THE COURT: If you will stand and give me your name please, ma'am.
> MRS. DE LEON: And my name is Rachel De Leon. And I just heard today about it, that all I know it has something to do with drugs. That's all I know.
> THE COURT: You have heard nothing else about the case?
> MRS. DE LEON: I didn't know nothing about it until just Monday.
> THE COURT: All right. In other words, you had—let me ask you again. I've interrupted you. As I understand it, you you know nothing about the case except what you heard in the last few days?
> MRS. DE LEON: No. All I know it has to do with drugs. That's all I know.
> THE COURT: All right. How did you come by that information?
> MRS. DE LEON: Because I told my boss lady that I was going to come over here, so my manager—you know—told me that it was going to do with drugs, told me the John H. Wood case and I said, "I don't know. I don't know nothing about it."
> THE COURT: All right. You heard nothing on radio or television about it at all?
> MRS. DE LEON: No, sir.
> THE COURT: You have not read anything about it at all?
> MRS. DE LEON: No, sir. I don't read newspapers.
> THE COURT: You have not discussed it with any person other than that?
> MRS. DE LEON: No, sir.
> THE COURT: Was there anything about your conversation with your boss that caused you to form an opinion about what might be involved here in this case?
> MRS. DE LEON: No. All she said was it had to do with drugs. She said, you know, she better not tell me nothing more about it, and I don't know nothing.
> THE COURT: All right. Did you form any opinion at all about whether or not Charles Harrelson or Jo Ann Harrelson or Elizabeth Chagra was, in fact, guilty or not guilty of any charge in connection with this case?
> MRS. DE LEON: Right. I didn't even know who was involved or anything.
> THE COURT: You had no idea of anything about the case from any source whatsoever?
> MRS. DE LEON: No, sir.

4. THE COURT: All right. Now, let me ask you about the newspaper and the television. Can you tell me what newspaper you read?
> MRS. MARTINEZ: The Light.
> THE COURT: And do you take it daily or all week?
> MRS. MARTINEZ: I take it daily, but I guess—like I said, I don't have time to read it. I just—but I'm not—I'm not trying to be facetious. I'm not blind. I see the headlines. Because in front of the store where I work, there is where they have the newspapers, where they sell them, but that's about all the information I really get, when I see the headlines.
> THE COURT: All right. Do you see the Light on a daily basis?
> MRS. MARTINEZ: Do I see the Light on a daily basis?
> THE COURT: Every day? Have you seen the San Antonio Light every day?
> MRS. MARTINEZ: Well, I see it every day, yes, sir, but I really don't have time to read it.
> THE COURT: All right.
> MRS. MARTINEZ: But I do see it.
> THE COURT: All right. Have you read articles in the San Antonio Light since the death of Judge Wood?
> MRS. MARTINEZ: Have I read articles about Judge Wood?
> THE COURT: Yes.
> MRS. MARTINEZ: No, because I usually—when I go through the newspapers, I usually go and see what ads there are or coupons.
> THE COURT: All right.
> MRS. MARTINEZ: And the comics.
> THE COURT: All right.

extensive knowledge or recollection of media reportage of the matter. We have carefully studied the voir dire examination of each juror and alternate. That examination convinces us that the trial judge was warranted in concluding that the jury he actually empanelled was impartial.

B. Failure to Discover Prejudice

■ Appellants next contend that the court's questioning of the venire was too cursory to ferret out prejudice, relying on the last method for obtaining reversal on the basis of pretrial publicity noted in *Chagra:*

> Finally, an appellant can establish both that pretrial publicity about his case raised "a significant possibility of prejudice," *United States v. Davis,* 583 F.2d 190, 196 (5th Cir.1978), and that the voir dire procedure followed by the district court in his case failed to provide a " 'reasonable assurance that prejudice would be discovered if present.'" *United States v. Hawkins, supra,* 658 F.2d

[279] at 283 [5th Cir.1981] (citations omitted). But, "[b]ecause the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the voir dire." *Rosales-Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (plurality opinion). *See also United States v. Gerald,* 624 F.2d 1291, 1296 (5th Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). Therefore, the district court's decision to employ a particular procedure will not be lightly overturned. *United States v. Hawkins, supra,* 658 F.2d at 283 (citation omitted).

*United States v. Chagra,* 669 F.2d 241, 250 (5th Cir.), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982).

We reject this contention. Assuming "a significant possibility of prejudice," we are

MRS. MARTINEZ: Like to read the comics, but that's about it.
THE COURT: Now, in those circumstances when you have seen it—
MRS. MARTINEZ: Uh-huh.
THE COURT: —have you noted,—that is, have you taken—been aware of the headlines that have appeared?
MRS. MARTINEZ: Oh, I'm aware of it, because like I said, they're there sticking out.
THE COURT: All right. As I understand you now, you only read the headlines and—have you read the—
MRS. MARTINEZ: The contents—
THE COURT: —the story itself?
MRS. MARTINEZ: The contents?
THE COURT: Yes.
MRS. MARTINEZ: No. I did when it happened—
THE COURT: All right.
MRS. MARTINEZ: —but that was it.
THE COURT: All right.
MRS. MARTINEZ: After that, I just put it behind my mind, because—I just don't know. It just wasn't something that interested me.
THE COURT: All right. After you quit reading the stories shortly after it happened, did there ever come a time when you read a complete article that was in any newspaper or the Light that you read entirely?
MRS. MARTINEZ: Entirely?
THE COURT: Yes.
MRS. MARTINEZ: Not after that. Like I said, it really didn't interest me.

\* \* \* \* \* \*

THE COURT: All right. Let me ask you now about the television. Have you received information from the television?
MRS. MARTINEZ: No, because I don't watch the news that much. I don't have time—
THE COURT: Do you watch it some?
MRS. MARTINEZ: And with the cable, they have the movies on, so they don't watch the news.
THE COURT: Excuse me. I didn't mean to interrupt you.
MRS. MARTINEZ: That's all right.
THE COURT: Have you watched news broadcasts from the time of Judge Wood's death up until yesterday?
MRS. MARTINEZ: Up until yesterday?
THE COURT: Have you seen news broadcasts?
MRS. MARTINEZ: Yes, I have seen news broadcasts, but it's usually the morning Today Show.
THE COURT: All right. Have you received any information from any news broadcasts on television that you recall?
MRS. MARTINEZ: No, not since it happened.
THE COURT: All right. Do you regularly watch any news broadcasts on television?
MRS. MARTINEZ: No. Like I said, I don't, because they usually have a movie going on or something, and I don't have time.

satisfied, for the reasons stated above, that the procedures followed by the careful trial court provided reasonable assurance that prejudice, if present, would have been discovered.

### 2. Other Contentions

■ Appellants make two additional points under this head. The first is that of a supposed failure by the trial court to allow counsel to participate actively in the voir dire process. Appellants correctly cite *United States v. Ledee*, 549 F.2d 990 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188 (1977), and *United States v. Ible*, 630 F.2d 389, 395 (5th Cir. 1980), for the proposition "that voir dire examination ... has little meaning if it is not conducted by counsel for the parties." *Ledee*, 549 F.2d at 993. It does not follow, however, that the trial court must permit counsel himself personally to question the venire members directly in order to avoid reversible error; Rule 24(a), Federal Rules of Criminal Procedure, clearly places this decision within the discretion of the trial court.[5] The trial court in this case satisfied the requirements of *Ledee* and *Ible* by itself posing the inquiries suggested by counsel. The issue is whether the voir dire examination was such as to uncover prejudice, not who conducted it. This was sufficient.

■ A final complaint is that the trial was conducted in the "John H. Wood, Jr. Courthouse," as a prominent memorial plaque on that building proclaims. It is said that the jury must have been "tainted by their exposure to this sentiment of the community as evidenced by the deceased's name on the courthouse walls." We are not persuaded. The sentiment in question is one of respect for the deceased judge, one doubtless shared by most participants in the proceedings. We do not perceive, however, how this can be translated into a prejudice against particular defendants.

It is conceded that respect for a victim may conduce to anger against his killer. It is not conceded that such respect is in any way improper, or that such anger, evoked by all brutal crimes, can be vitiated by a change in physical surroundings. Murder is not so trivial an event. Given the careful examination and prophylactic instructions of the trial court, we do not see how this mute reminder of community respect for the dead could have prejudiced the panel. Impartiality does not demand that a jury forget the name of the victim.

### 3. Prejudicial Publicity During Trial; Sequestration

Trial of the case was actively followed and sometimes sensationally reported by the media, a circumstance made the basis of various renewed motions by the appellants for change of venue, for polling the jury regarding various media disclosures, and for other relief. Especial complaint is made of the play accorded a news conference called by the newly-elected state district attorney at which he disclosed plans to seek the death penalty for anyone guilty of the Wood murder.[6] Reports of the conference and article were carried on the local television news that night and again the next morning. Appellants complain to us of the trial court's denial of these motions and of its refusal to sequester the jury before it began its deliberations. These contentions were, as we have noted, ad-

---

**5.** It provides:

> (a) Examination. The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors *or may itself conduct the examination.* In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper. (emphasis added).

**6.** The article, which noted that appellants were currently being tried in federal court for the death, appeared about six weeks into the trial on page 3A of an afternoon paper under the banner "Death to Wood's Killers" and a subhead "Millsap vows his new team will get 'em." The body of the article is relatively unobjectionable, being composed mainly of an account of the new prosecutor's appointment of various assistants.

dressed to the sound discretion of the trial court. *See also United States v. Phillips,* 664 F.2d 971 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). We review the exercise of that discretion for abuse.[7]

We have recognized a stricter standard for "during trial" publicity breaches than for pretrial ones. *United States v. Williams,* 568 F.2d 464 (5th Cir.1978). The proper procedure for dealing with such breaches was laid down for our Circuit in *United States v. Herring,* 568 F.2d 1099 (5th Cir.1978). There we prescribed a two-step threshold inquiry, followed by a voir dire examination of the jurors, if indicated. The first step in the threshold inquiry requires a determination by the trial court whether the material complained of " 'goes beyond the record … and raises serious questions of possible prejudice' to the litigants." *Id.* at 1104. There can be little doubt that this requirement is met by matter brought to the trial court's attention here. Since it does, we turn to the second threshold step:

> If, upon completing the first step of its inquiry, the trial judge concludes that material has been disseminated that does in fact "raise serious questions of possible prejudice," a second inquiry should follow to determine the likelihood that the damaging material has in fact reached the jury. Initially, of course, the court should consider whatever precautions it has already taken to insulate the jury. For example, if the jury has been sequestered, one would normally expect that no extra-record material has reached the jury room. By the same token, if the material was published in a relatively obscure manner—say, in an out-of-town newspaper—one would expect that the material had not reached even an unse-

questered jury. Another relevant point lies in the nature of the trial judge's previous instructions on the matter. Has the court told the jury not merely to disregard but *not to examine at all* any external information on the case, especially that which appears in the news media? Has the court so instructed the jury on a regular basis, and how much time has elapsed since the court's last directive and the dissemination of the material in question.

*Id.* at 1105. Determining that no prejudicial matter had reached the jury, the trial court halted at the second step.[8] Obedient to *Herring,* we review the trial court's precautions to insulate the jury, the nature of the trial court's instructions to the jury regarding such matter, and the frequency and regularity of those instructions.

We have already determined that the court empanelled an impartial jury. Intending to keep it so, even before its selection and at the outset of the voir dire, the trial judge had included in his comprehensive instructions to the venire the following:

> Now, I anticipate that in this particular case, there will continue to be extensive television, radio and possible newspaper coverage. *You're instructed that you are not, from this point on, to listen to any television or radio news commentary or news broadcasts, and you will not from this point on, except under the direction of the Court, review any newspaper nor read any newspaper at all.* The Marshals will have papers prepared for you that will have any reference to this particular case or other cases that are involved stricken, so that you can read it without having to worry about getting any information from any

---

7. No contention can be made that this case falls under the rubric of such "media circus" authorities as *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). The conduct of the trial was strictly and correctly controlled by the trial court, and no havoc was created in the courtroom at any time, by the press or by anyone else.

8. Voir dire regarding particular matter carries the obvious danger of tainting the jurors by informing them of prejudicial circumstances of which they had been unaware. *Cf. Murphy v. Florida,* 421 U.S. 794, 800 n. 3, 95 S.Ct. 2031, 2036 n. 3, 44 L.Ed.2d 589 (1975). It should therefore be avoided where it properly can be.

other source. This is important to you and important to the Court. (emphasis supplied.)[9]

This and similar instructions were repeatedly delivered to the venire members during the lengthy process of jury selection. In addition, the veniremen were instructed:

> If you know of or learn anything about this case or any other case where you may be going to trial, except from the evidence that is admitted during the course of the trial, you should tell the Court about it at once.

After the jury was empanelled and the trial commenced, the trial judge repeatedly cautioned the jury to recall his instructions regarding extraneous matter, to do nothing that might impair their impartiality, and to report to him immediately the occurrence of any such event. Not a day of trial passed without the delivery by the trial judge of such an instruction to the jury, and almost invariably he delivered both a cautionary instruction at the close of proceedings and a general inquiry at the outset of the next day's proceedings whether anything had occurred since the last recess that might have affected their impartiality.

■ Our painstaking examination of the entire record and the trial court's repeated instructions convinces us that the jury was effectively shielded from contamination by publicity during the trial. Only one point troubles us: the form taken by the court's continuing instructions to the jury regarding incidents occurring during trial. This was, in general, whether anything had happened during the recess that might have impaired any juror's impartiality. Such an instruction, taken literally, leaves it to the individual juror to determine whether, even though some incident occurred, it was of such a character as to affect his impartiality; and although no special point is made of this circumstance by any appellant, we are constrained to observe that a better inquiry would have been whether any incident *whatever* involving extraneous publicity (or other impropriety) had occurred during the recess, leaving to the court to determine after investigation whether in the *court's* judgment it was of such a nature as to have affected the juror's impartiality.

For several distinct reasons, however, the instruction is not reversible error. In the first place, no such complaint of it is made to us. In the second, the instruction was repeatedly delivered to the jury by the trial court without objection on such a ground. And finally, taken together with the judge's instruction to the venire members, quoted above, to advise him of anything learned other than "from the evidence that is admitted during the course of the trial," we conclude that the jury was adequately advised and constantly reminded that the court regarded *any* receipt by them of extraneous matter as likely to impair their impartiality and hence required to be divulged.

■ The above likewise disposes of appellants' joint complaint that the court declined to sequester the jury. Since we have concluded that the jury was not contaminated, whether it should have been sequestered is of no consequence. Thus there is no occasion for us to review the trial court's exercise of that discretion on the issue of sequestration which is reposed in it by Rule 24, Federal Rules of Criminal Procedure.

### 4. Recusal of the Trial Judge

Appellants were tried before Judge William S. Sessions, a federal judge of the Western District of Texas, on charges arising from the murder of John H. Wood, Jr., also a federal judge of that district. Judge Sessions had known and worked with Judge Wood for eight or nine years at the time of the latter's death and admired him. The relationship was collegial and there is no evidence of any special social relationship between the two judges or between

---

**9.** Given the degree of indifference of these particular jurors to the media revealed by the voir dire, as exemplified by the colloquies set out in notes 3 and 4 above, such an instruction was more likely to be effective here than in the ordinary case.

the Wood and Sessions families. Judge Sessions was an honorary pallbearer at Judge Wood's funeral and eulogized him at several memorial ceremonies. Because of the murder, Judge Sessions was guarded 24 hours a day until December 2, 1980. The appellants contend that these facts are sufficient to render the trial court's denial of their motion for recusal reversible error.

Appellants moved for recusal of the trial court pursuant to 28 U.S.C. § 455(a), which provides, "Any justice, judge, magistrate or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." A motion for recusal is committed to the sound discretion of the district judge; denial of such a motion will not be reversed on appeal unless the judge has abused his discretion. *Phillips v. Joint Legislative Committee*, 637 F.2d 1014, 1021 (5th Cir. 1981), *cert. denied*, 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982); *accord Davis v. Board of School Commissioners*, 517 F.2d 1044, 1052 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). Whether an abuse of discretion has occurred is determined "on the basis of conduct which shows bias or lack of impartiality." *United States v. Phillips*, 664 F.2d 971, 1002 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982), *quoting Davis*, 517 F.2d at 1052. The alleged biased or prejudiced conduct must, as a general rule, be personal to mandate disqualification, *United States v. Holland*, 655 F.2d 44, 47 (5th Cir.1981), *accord In re Corrugated Container Antitrust Litigation*, 614 F.2d 958, 965 and n. 16 (5th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980); it "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966), *quoted in Parrish v. Board of Commissioners*, 524 F.2d 98, 107 (5th Cir. 1975) (en banc) (concurring opinion), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). The conduct complained of must, in addition, be such as would cause a reasonable person, knowing all the circumstances, to harbor doubts about the court's impartiality. *Hall v. Small Business Administration*, 695 F.2d 175, 179 (5th Cir.1983).

Although it is difficult to discern the legal grounds of appellants' argument, their position appears to be that the facts stated above meet these tests or, alternatively, that we should ignore the tests and sustain their contention on the basis of common sense. Both positions lack merit.

Appellants' own authorities clearly demonstrate that recusal is not warranted absent specific instances of conduct indicating prejudice against a defendant. An example of such conduct may be found in *Webbe v. McGhie Land Title Co.*, 549 F.2d 1358 (10th Cir.1977), cited by appellants, where "the trial judge, without reading the depositions, and based on the oral argument of counsel for Webbe and Kitt, announced that the insurance company was 'stuck' before even permitting counsel for the insurance company to address the court." *Id.* at 1361. It is not surprising that this conduct was found to indicate bias. Nor is it surprising that bias was found in *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); the *Murchison* trial judge called the defendant's personal attitude "not only ... insolent, ... but defiant," and insisted on putting this statement on the record. *Id.* at 138, 75 S.Ct. at 626. We have carefully examined this record; nowhere in it is to be found any remark by Judge Sessions smacking of impropriety in the faintest degree, let alone any such as those instanced above.

For reasons that are unclear to us, appellants cite *Fredonia Broadcasting Corp. v. RCA Corp.*, 569 F.2d 251 (5th Cir.), *cert. denied*, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978), and *Hall v. Small Business Administration, supra*, both of which concern the appearance of former law clerks before the judges by whom they were employed; their citations to *Rice v.*

*McKenzie,* 581 F.2d 1114 (4th Cir.1978) (federal appellate judge may not review his own decisions as state trial judge), and *Potashnick v. Port City Construction Co.,* 609 F.2d 1101 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980) (recusal warranted by personal and professional connection to counsel for one party) are equally inapposite. Appellants' use of *United States v. Holland,* 655 F.2d 44 (5th Cir.1981), is novel. The *Holland* defendant had been tried and convicted on a previous occasion. He had successfully appealed this conviction on grounds provided by the trial judge's unrecorded conversation with the jury, to which he had not objected at the time. At a second trial before the same court, the judge repeatedly asserted that the defendant had "broken faith" with the court by appealing the first conviction, and stated for the record that "he intended to increase Holland's sentence because of the incident which he had described." *Id.* at 45. Holland was convicted again and appealed again, this time on the basis of § 455. We agreed that the trial judge ought to have disqualified himself:

> The trial judge's remarks ... reflect a personal prejudice against Holland for successfully appealing his conviction on the basis of the judge's actions during the prior trial. The fact that these comments were made in a judicial context ... does not prevent a finding of bias.

*Id.* at 47 (footnote omitted). Appellants argue that by "logical extension" *Holland* requires recusal whenever a trial court's remarks reflect "personal respect or admiration for one side of the lawsuit or the other." *Holland* requires no such thing. *Holland,* the other authorities cited by appellants, and those cited by the government, *see e.g., United States v. Archbold-Newball,* 554 F.2d 665 (5th Cir.), *cert. denied,* 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 496 (1977), uniformly support the proposition that recusal is not warranted in a criminal case absent conduct by the trial court specifically indicating personal prejudice against the defendant. *See Ungar v. Sarafite,* 376 U.S. 575, 585–88, 84 S.Ct. 841, 847–49, 11 L.Ed.2d 921 (1964). More apposite to the circumstances presented here are such *a fortiori* authorities as *United States v. Phillips,* 664 F.2d 971 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2695, 73 L.Ed.2d 1354 (1982), in which the trial judge was affirmed in declining to stand recused even in the face of evidence that certain defendants were plotting to assassinate *him.*

Finally, appellants' contention incorporates a fundamental logical flaw: whatever the relationship between the two judges was, it can at most have served to create a degree of hostility toward the actual killers. As such, it is entirely consistent both with a desire that those not guilty be acquitted and with one that the guilty be convicted. At all stages of the trial and to this day, appellants have vigorously maintained that they are not the guilty parties; we are unwilling to presume, in the absence of a far stronger showing than has been made here, that a reasonable person would entertain doubts that the careful and seasoned trial judge who sat in this case would prejudge their guilt.

■ In short, Judge Sessions' conduct advanced by appellants as a basis for his recusal demonstrates only such behavior as one might expect of a civilized and honorable man upon the death of a colleague— and that whether or not he harbored any particular affection for him. As such, it falls far short of casting his impartiality in doubt to reasonable people.

### 5. *Attorney-Client Privilege*

Joseph Chagra testified at trial to his conversations with Charles Harrelson. Harrelson moved before trial to have this testimony excluded on the ground that Joseph Chagra was his attorney at the time in question, rendering their conversations protected by the attorney-client privilege. The trial court denied his motion because it found that the relationship between Chagra and Harrelson was not that of attorney and client. Harrelson, joined by his codefendants, now contends that the trial court's denial of his motion and subsequent admis-

sion of Joseph Chagra's testimony constituted reversible error. Finding no error, we affirm.

■■■■■ One who wishes to assert the attorney-client privilege bears the burden of proving the existence of an attorney-client relationship. *United States v. Kelly,* 569 F.2d 928, 938 (5th Cir.), *cert. denied,* 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978). Among the elements required to be proved are that the asserted holder of the privilege made the communications as to which the privilege is asserted to one acting as a lawyer, and that the communications were made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Grand Jury Proceedings,* 517 F.2d 666, 670 (5th Cir.1975). "[I]t is well established that the privilege does not apply where legal representation was secured in furtherance of intended, or present, continuing illegality." *United States v. Hodge & Zweig,* 548 F.2d 1347, 1354 (9th Cir.1977), *quoted in In re Grand Jury Proceedings,* 680 F.2d 1026, 1028 (5th Cir.1982) (en banc); once the government has made a prima facie showing that the attorney was retained to promote intended or continuing criminal activity, the privilege may not be asserted. *Id.; accord, United States v. Dyer,* 722 F.2d 174, 178 (5th Cir.1983).

■■■ As a preliminary matter, Harrelson produced no evidence showing Joseph Chagra to have been retained by him as a lawyer in connection with this case. Harrelson further failed to produce any evidence showing that Joseph Chagra was acting as a lawyer during the conversations at issue, or that these conversations had even the most tenuous connection with legal services. There was, however, substantial and convincing evidence showing the relationship between Chagra and Harrelson to have been that of coconspirators rather than attorney and client; Harrelson's own testimony at trial fully supports this view.[10]

There being no evidence whatsoever to support Harrelson's motion asserting the attorney-client privilege, the trial court correctly denied it. As the writer has noted in another case, "drawing the cloak of the attorney-client privilege over such arrangements seems to me a result so egregiously undesirable that it should not be arrived at unless inexorably compelled by law or logic. I do not see that it is." *In re Grand Jury Proceedings,* 663 F.2d 1057, 1064 (5th Cir.1981) (Gee, J., dissenting).

6. *Marital Privilege*

Between October 1980 and January 1981, Elizabeth Chagra made a number of visits to her husband Jamiel Chagra at the United States Penitentiary at Leavenworth, Kansas. Three of their conversations were intercepted by government wiretap and introduced against Mrs. Chagra at trial. The first concerned Mrs. Chagra's delivery of money to Charles Harrelson in payment of his services as murderer of Judge Wood.

---

**10.** The following testimony is representative:

Q. Okay. What occasion did you have to be in El Paso on the Memorial Day weekend of 1980?
A. I went out to see Joe Chagra.
Q. What was your purpose in going to see him that day?
A. To get some money and to get some cocaine.
Q. You have already got—you got five thousand from him the first visit, ten thousand the second visit, and what did you get from him, if anything, on the third visit?
A. Ten thousand, and I don't know how much cocain [sic], but—
Q. At that time—
A. A couple of ounces, I believe.

\* \* \* \* \* \*

Q. Okay. So this was all part of the scam in order to get five thousand dollars and hopefully some more money out of him?
A. Well, certainly. I didn't exact—I don't recall feeling the need to ingratiate myself to Joe Chagra at that particular moment in order to extract funds from him, but I was aware that he had access to large sums of cash, and other—well, let's say cocaine. And I was certainly anxious to speculate that association or relationship in any way I could, and the bottom line is, of course, cash.

We are prepared to accept Harrelson's assessment of "the bottom line" in his relationship with Joseph Chagra. The provision of cash and cocaine may be a service, but it is not a legal service.

The second and third concerned the delivery and Mrs. Chagra's prior knowledge of her husband's intention to employ Mr. Harrelson to murder Judge Wood. All three were repetitions of conversations held earlier, before the murder. Mrs. Chagra contends that these conversations were within the marital privilege and that it was reversible error to admit them against her at trial.

 The marital privilege protects "information privately disclosed between husband and wife in the confidence of the marital relationship." *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). "[C]onversations between husband and wife about crimes in which they are jointly participating when the conversations occur are not marital communications for the purpose of the marital privilege, and thus do not fall within the privilege's protection of confidential marital communications." *United States v. Mendoza*, 574 F.2d 1373, 1381 (5th Cir.), *cert. denied*, 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978); *accord, United States v. Entrekin*, 624 F.2d 597, 598 (5th Cir. 1980), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 350 (1981).

 Mrs. Chagra argues that the communications at issue do not fall within the *Mendoza* exception because they refer to past crimes, citing *Ivey v. United States*, 344 F.2d 770 (5th Cir.1965), and *United States v. Williams*, 447 F.2d 894 (5th Cir. 1971), in support. Even assuming these cases to stand for the proposition that conversations about past crimes are within the marital privilege, a highly questionable assumption, their continued vitality after *United States v. Archer*, 733 F.2d 354 (5th Cir.1984), is dubious in the extreme given the *Archer* court's explicit statement that "*Ivey* and *Williams* are no longer to be followed." *Id.* at 358.

Mrs. Chagra's argument fails even if one accepts her interpretation of *Ivey* and *Williams* and they remain good law: the conversations objected to are not about past crimes. The original conversations clearly referred not to crimes past but to crimes

contemplated. They were repeated in furtherance of a continuing crime, conspiracy to obstruct justice. It is obviously necessary to know what one has to hide in order to hide it. *See United States v. Haldeman*, 559 F.2d 31, 111 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

The trial court was therefore justified in admitting the conversations of Chagra and his wife and did not err in so doing.

7. *Electronic Surveillance*

 The government conducted court-authorized electronic surveillance of Jamiel Chagra at the United States Penitentiary in Leavenworth, Kansas. Conversations between Chagra and his wife, Elizabeth, and between Chagra and his brother, Joseph Chagra, an attorney, were recorded and introduced as evidence at the trial of Mrs. Chagra and the Harrelsons. Before trial, appellants moved unsuccessfully to suppress this evidence. On appeal, Mrs. Chagra and the Harrelsons renew their contention that admission of the evidence was reversible error.

Appellants' claim is grounded on 18 U.S.C. § 2518(5), which states in pertinent part that electronic surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." Thus, under this section, interception of privileged communications must be minimized. Appellants contend that conversations between the Chagras were covered by the marital privilege and that conversations between Chagra and his brother were covered by the attorney-client privilege. From this premise, they argue that the government failed to minimize interception of privileged conversations and that admission of such impermissibly intercepted conversations constituted reversible error.

Appellants' argument fails because the conversations in question were unprivileged. As is discussed above, Mr. and Mrs. Chagra's conversations were not protected by the marital privilege because they were

conducted in furtherance of a continuing criminal conspiracy. Jamiel Chagra's conversations with his brother are unprivileged for the same reason. Further, even assuming these conversations to be covered by the attorney-client privilege, Jamiel Chagra alone has standing to appeal the trial court's denial of its existence. 8 Wigmore, *Evidence* §§ 2196, 2321 (McNaughton rev. 1961); McCormick, *Evidence* § 92 (2d ed. 1972); *see United States v. Crockett,* 534 F.2d 589, 604 (5th Cir.1976); *see also United States v. Dien,* 609 F.2d 1038, 1043–44 (2d Cir.1979) (*citing Crockett*); *United States v. Fredericks,* 586 F.2d 470, 480–81 (5th Cir.1978), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979).

Section 2518(5) requires the government to minimize the interception of privileged communications. None of the conversations intercepted by the government in this case was privileged; therefore, the government complied with the minimization requirement of § 2518(5). The trial court's ruling was thus correct, and we affirm it.

■ The Harrelsons also complain of the admission of evidence obtained through electronic surveillance. Mrs. Harrelson visited her husband during his incarceration at the Harris County Jail. Their conversations were recorded by John Spinelli, a career criminal who occupied the cell next to Harrelson's. Spinelli used a tape recorder disguised as a radio to record these conversations; the device was given to him for that purpose by the FBI. The Harrelsons moved before trial to suppress the conversations recorded by Spinelli; their motion was denied. They now contend that the trial court's denial of their motion and subsequent admission of the conversations as evidence at trial constituted reversible error. Disagreeing, we affirm.

Title 18 U.S.C. § 2511 prohibits the interception and disclosure of wire or oral communications unless conducted in accordance with other provisions of the chapter. Under § 2516, the FBI may intercept wire or oral communications only after an appli-

cation for interception has been authorized by the Attorney General of the United States or an assistant attorney general specially designated by him; the application must be approved and an appropriate order issued by a federal judge of competent jurisdiction. No such authorization was sought by the FBI for its interception of the conversations between Charles and Jo Ann Harrelson, who contend that this want of authorization rendered their conversations inadmissible as evidence against them under § 2515, which states,

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

The government argues that the conversations at issue are not within the protection afforded by § 2510 *et seq.* because they are not "oral communications" as defined in § 2510(2): "'oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation."

The question presented here is thus whether the Harrelsons had a reasonable expectation of privacy as they spoke to each other in jail. The answer must be that they did not. It is unnecessary to consult the case law to conclude that one who expects privacy under the circumstances of prison visiting is, if not actually foolish, exceptionally naive; Harrelson, highly intelligent and no neophyte at prison life, was neither. The evidence indicates as much; the precautions taken to prevent eavesdropping show the Harrelsons to have been aware of the possibility of it.[11] That

**11.** Harrelson testified to personal knowledge of

electronic eavesdropping in prison. While in-

their precautions were unsuccessful does not mean that the Harrelsons believed themselves to be conversing privately; rather, it means only that they underestimated the technological resources available for eavesdropping at the Harris County Jail. Mistaking the degree of intrusion of which probable eavesdroppers are capable is not at all the same thing as believing there are no eavesdroppers.

The case law tends to support this conclusion, although no case was found directly on point. *See, e.g., United States v. Pui Kan Lam,* 483 F.2d 1202, 1206 (2d Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974) (citing with approval *People v. Santos,* 26 Cal.App.3d 397, 102 Cal.Rptr. 678 (Ct.App. 2d Dist. 1972), in which the court held that interception of a conversation between husband and wife over a jail intercom telephone was not the interception of an "oral communication" within the wiretap statute, in part because an expectation of privacy would not have been reasonable under the circumstances); *see also United States v. Lilly,* 576 F.2d 1240, 1244 (5th Cir.1978), and cases cited therein (government needs neither warrant nor probable cause to conduct search or seizure in prison because of prisoners' decreased expectations of privacy and inherent exigencies). Language from *Lanza v. New York* is also apposite:

> [I]t is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office or a hotel room. In prison, official surveillance has traditionally been the order of the day.

*Id.,* 370 U.S. 139, 143, 82 S.Ct. 1218, 1220, 8 L.Ed.2d 384 (1962), *quoted in United States v. Hearst,* 563 F.2d 1331, 1345 (9th Cir.1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). The *Hearst* court rejected the argument that *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), a case relied on by appellants here,[12] significantly reduced the precedential value of *Lanza.* 563 F.2d at 1345. The soundness of *Hearst* in this respect is apparent—different considerations clearly apply to upholding the reasonable expectation of privacy in a public telephone booth and in a prison. *See United States v. Paul,* 614 F.2d 115, 117–20 (6th Cir.), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980) (Phillips, J., concurring). That Congress was aware of and sensitive to these considerations is demonstrated by the legislative history of the wiretapping statute:

> Paragraph (2) defines "oral communication" to include any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation. The definition is intended to reflect existing law. See *Katz v. United States,* 88 S.Ct. 507, 389 U.S. 347 [19 L.Ed.2d 576] (1967). Compare *United States v. South Eastern Underwriters Assn.,* 64 S.Ct. 1162, 322 U.S. 533 [88 L.Ed. 1440] (1944) with *Lee v. Florida,* 191 So.2d 84 ([Fla.App.] 1966), *certiorari granted,* [389 U.S. 1033, 19 L.Ed.2d 820] Jan. 15, 1968, No. 174, 1967 Term. The person's subjective intent or the place where the communication is uttered is not necessarily the controlling factor. Compare *Linnell v. Linnell,* [249 Mass. 51], 143 N.E. 813 (Mass. 1924), with *Freeman v. Freeman,* [238 Mass. 150], 130 N.E. 220 (Mass.1921).

---

carcerated in California, he had in fact cooperated with the authorities by recording the conversations of a fellow inmate and was thus not unfamiliar with the practice.

We emphasize that what we say here is addressed to the situation of the ordinary interspousal prison visit, one in which the parties must take the circumstances as they find them and communicate on such terms as are offered. Visitations of some special variety may call forth a different rule. Nor would our observations here translate directly to attorney-client visitations, where the parties have a right to assured confidentiality and are, in the normal

case, entitled to assume—and if necessary to demand—it.

12. Appellants' reliance on *United States v. Duncan,* 598 F.2d 839 (4th Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979), is similarly misplaced. The *Duncan* court cited *Santos, supra,* and *People v. Califano,* 5 Cal. App.3d 476, 85 Cal.Rptr. 292 (1970), for the proposition that persons in custody who expect their conversations may be monitored have no expectation of privacy. *Duncan,* 598 F.2d at 850 n. 7.

*Nevertheless, such an expectation would clearly be unjustified in certain areas; for example, a jail cell (Lanza v. New York, 82 S.Ct. 1218, 370 U.S. 139 [8 L.Ed.2d 384] (1962)) or an open field (Hester v. United States, 44 S.Ct. 445, 265 U.S. 57 [68 L.Ed. 898] (1924)). Ordinarily, however, a person would be justified in relying on such expectation when he was in his home (Silverman v. United States, 81 S.Ct. 679, 365 U.S. 505 [5 L.Ed.2d 734] (1961)) or office (Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41 [18 L.Ed.2d 1040] (1967)), but even there, his expectation under certain circumstances could be unwarranted, for example, when he speaks too loudly. See State v. Cartwright, [246 Or. 120], 418 P.2d 822 (Ore. 1966), certiorari denied 87 S.Ct. 961, 386 U.S. 937 [17 L.Ed.2d 810] (1967). The person's expectation that his communication is or is not subject to "interception," defined in paragraph (4), discussed below, is thus to be gathered and evaluated from and in terms of all the facts and circumstances.*

S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 2112, 2178 (emphasis added).

The trial court's denial of appellants' motion to suppress is thus supported by both legislative history and case law. It is also supported by evidence showing the Harrelsons to have known or suspected that attempts would be made to eavesdrop on their conversations at the jail. In light of this evidence, we affirm the trial court's admission of the conversations; they were not "oral communications" within the meaning of § 2510(2). Our holding should not, however, be construed as approving the government's failure to seek proper authorization for its electronic surveillance. Such conduct deserves no encouragement, but is rather to be deprecated; we do so.

### Individual Contentions: Elizabeth Chagra

#### A. The Conspiracy Charge

Elizabeth Chagra was charged with conspiracy to commit murder in an indictment that read, in pertinent part, as follows:

Elizabeth Chagra [and her codefendants] willfully and knowingly did combine, conspire, confederate and agree together and with each other ... to kill with premeditation and malice aforethought, John H. Wood, Jr., ... on account of the performance of his official duties in violation of Title 18, U.S.Code, Sections 1111 and 1114, all in violation of Title 18, U.S.Code, Section 1117.

At her trial on this charge, Mrs. Chagra requested the following jury instruction:

You are instructed that the government must prove beyond a reasonable doubt that each defendant charged with conspiracy had at least the criminal intent necessary to commit the offense which is the object of the conspiracy. Under Count 1, the offense which is the object of the conspiracy is the killing of a federal judge with the requisite intent of premeditation and malice aforethought. Therefore, under Count 1 the government must prove beyond a reasonable doubt that Elizabeth Chagra conspired to kill John H. Wood Jr. with the requisite intent of premeditation and malice aforethought. If the government fails to prove such an intent beyond a reasonable doubt you must acquit the defendant.

R. 503. The court refused Elizabeth's request and instead instructed the jury that it could convict her of the charge if it found the government to have shown the following:

1. That two or more persons, in some way or manner, positively or tacitly came to a mutual understanding or agreement to try to accomplish the murder of John H. Wood, Jr., a United States District Judge for the Western District of Texas, on account of the performance of his official duties.

2. That the named defendant under consideration knowingly and willfully became a member of such conspiracy.

3. That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the

means or methods or overt acts described in the indictment.

4. That such overt act was knowingly committed at or about the time alleged in the indictment in an effort to effect or to accomplish some object or purpose of the conspiracy.

When the jury, on the fourth day of its deliberations, requested "the legal definition of the term 'conspiracy,'" the court responded by repeating the instruction quoted above; an hour later the jury found Mrs. Chagra guilty.

Mrs. Chagra objected to this instruction at trial and on appeal contends that it constitutes reversible error. There are two grounds for her contention. First, she asserts that the instruction permitted her to be convicted of the conspiracy charge on a government showing of willfulness, when proof of premeditation and malice aforethought should have been required. Second, she claims that the instruction constituted impermissible constructive amendment of the indictment because the offense it describes differs from that of the indictment. Neither of these arguments is without merit.

Mrs. Chagra's first argument is based on the rule, first set forth in *Ingram v. United States*, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959), that "conspiracy to commit a particular substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself." *Id.* at 678, 79 S.Ct. at 1319, *quoted in United States v. Shaddix*, 693 F.2d 1135, 1139 (5th Cir.1982) (emphasis in original). *Accord, United States v. Beil*, 577 F.2d 1313, 1314–15 (5th Cir.1978), *cert. denied*, 440 U.S. 946, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979) ("It is clarion clear that 'in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself,'" *quoting United States v. Feola*, 420 U.S. 671, 686, 95 S.Ct. 1255, 1264, 43 L.Ed.2d 541 (1975)).

■■■ Applying this rule to her case, Chagra contends that the substantive offense she allegedly conspired to commit was first degree murder, as defined in 18 U.S.C. § 1111. This statute states in pertinent part that

Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing ... is murder in the first degree.

Any other murder is murder in the second degree.

First degree murder under § 1111 clearly requires the criminal intent of premeditation and malice aforethought. Thus, under *Feola, Ingram*, and numerous Fifth Circuit decisions, *see, e.g., United States v. Lichenstein*, 610 F.2d 1272, 1276–77 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980); *United States v. Wieschenberg*, 604 F.2d 326, 331 (5th Cir.1979), proof of premeditation and malice aforethought is required to sustain a conviction of conspiracy to commit first degree murder under that section.

The government argues, however, that the substantive offense Elizabeth Chagra conspired to commit was not first degree murder under § 1111, but killing a federal judge in violation of § 1114, the relevant portion of which provides, "Whoever kills any judge of the United States ... on account of the performance of his official duties ... shall be punished as provided under sections 1111 and 1112 of this title." The government contends that the absence in § 1114 of any mention of premeditation or malice aforethought means that no proof of either was required to sustain Mrs. Chagra's conspiracy conviction. The government ignores the logical extension of its position: because § 1114 contains no mention of criminal intent of *any* sort, no criminal intent need be shown to obtain a conviction under this section. On such reasoning, the surgeon at an unsuccessful operation which resulted in a judge's death would be liable to prosecution.

■ This is patently absurd. Section 1114, as the government itself notes, generally proscribes the unlawful killing of federal officers; it is a jurisdictional statute. Relevant case law clearly demonstrates the truth of this assertion; we have found no case in which a prosecution was based on § 1114 alone. Rather, particular offenses are invariably defined by reference to §§ 1111 and 1112. *See, e.g., United States v. Guyon,* 717 F.2d 1536, 1537 (6th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984); *United States v. Peltier,* 585 F.2d 314, 318 (8th Cir.1978), *cert. denied,* 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979); *United States v. Rivera,* 513 F.2d 519, 521 (2d Cir.1975), *cert. denied,* 423 U.S. 948, 96 S.Ct. 367, 46 L.Ed.2d 284 (1975); *United States v. Hull,* 441 F.2d 308, 309 (7th Cir.1971).

■ Chagra's own indictment belies the government's position; it charges her with conspiracy to kill Judge Wood "with premeditation and malice aforethought" in violation of 18 U.S.C. §§ 1111, 1114, and 1117. The government yet argues that proof of premeditation and malice aforethought is necessary only for a conviction of first degree murder under § 1111 and not for a conviction of conspiracy under § 1117 because § 1117 contains its own scale of punishment. This is irrelevant, illogical, and plainly contrary to *Feola* and *Ingram.* Chagra was charged in her indictment with conspiracy to commit first degree murder; first degree murder requires the criminal intent of premeditation and malice aforethought. It was therefore incumbent upon the government to prove Elizabeth Chagra had that criminal intent and incumbent upon the trial court so to instruct the jury. As we stated in *United States v. Malatesta,* 590 F.2d 1379, 1381 (5th Cir.), *cert. denied,* 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979),

> Since knowledge, actual participation, and criminal intent are the necessary elements of the crime of conspiracy, the government must, of course, prove each of those elements beyond a reasonable

doubt. That being so, the jury in a criminal trial must be so instructed.

*Id.* (citations omitted). Elizabeth Chagra's jury was not so instructed. The trial court's failure to give Mrs. Chagra's instructions on premeditation and malice aforethought, and its substitution of willfulness as the criminal intent required for a first-degree murder conviction, constitute reversible error under the three-part test set forth in *United States v. Grissom,* 645 F.2d 461, 464 (5th Cir.1981). First, Chagra's requested instruction was a correct statement of the law. Second, it was not substantially given by the charge when read as a whole. The court instructed the jury that proof of premeditation and malice aforethought was necessary to convict *Charles Harrelson* of first-degree murder under §§ 1111 and 1114. The government's contention that this adequately instructed the jury on criminal intent as to *Elizabeth Chagra* is clearly without merit. Finally, Mrs. Chagra's instruction concerned an important point in the trial; failure to give it seriously impaired her ability effectively to present a given defense, to wit, that she did not conspire with premeditation and malice aforethought. *See United States v. Davis,* 583 F.2d 190, 192–95 (5th Cir.1978) (conspiracy convictions reversed because of erroneous instruction on intent); *see also Guyon,* 717 F.2d at 1545–50 (Jones, J., dissenting). The significance of the difference between willfulness on the one hand and premeditation and malice aforethought on the other is obvious.

■ Mrs. Chagra further argues that the trial court's instruction constructively amended her indictment by changing the element of criminal intent from premeditation and malice aforethought to willfulness. In this Circuit,

> The trial judge's luxuriant interpretation of the indictment *requires* reversal if, considering the evidence, it so modifies the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment. *United States v. Salinas,* 601 F.2d at 1290. Such an altera-

tion of the elements of the offense charged is reversible error per se. *United States v. Ylda,* 653 F.2d 912, 914 (5th Cir.1981) (emphasis in original). It was held reversible error in *United States v. Salinas,* 654 F.2d 319 (5th Cir.1981), to instruct the jury that conviction could be based on a finding that defendants were bank officers, directors, agents, or employees when the indictment charged them only as bank director and bank president, respectively. The instruction in Mrs. Chagra's case clearly diverged at least as far from her indictment as did the *Salinas* instruction. Other cases, *e.g., United States v. Pazsint,* 703 F.2d 420, 423 (9th Cir.1983); *United States v. Bizzard,* 615 F.2d 1080, 1081–82 (5th Cir.1980); *United States v. Carroll,* 582 F.2d 942 (5th Cir. 1978), support the conclusion that the trial court's instruction constructively amended Mrs. Chagra's indictment and thus constitutes reversible error; we note that the government has not argued otherwise.

We hold, therefore, that Elizabeth Chagra's conviction of conspiracy to commit murder must be reversed and her case remanded for a new trial both because the trial court's instruction allowed the jury to find Mrs. Chagra guilty without the requisite proof of premeditation and malice aforethought and because that instruction constructively amended her indictment.

B. *Severance*

Elizabeth Chagra moved repeatedly for severance of her trial from that of the Harrelsons under Rule 14, Fed.R.Crim.P., which provides for relief from prejudicial joinder.[13] She contends on appeal that the trial court's denial of these motions constitutes reversible error. Mrs. Chagra's contention is mooted as to the offense charged in Count 1 of the indictment, conspiracy to commit murder, by our decision to vacate

that conviction and remand that part of the case for a new trial at which she will be the sole defendant. The question remains as to whether the trial court properly refused to sever Mrs. Chagra's trial from that of the Harrelsons on the offense charged in Count 3 of the indictment, conspiracy to obstruct justice. We are convinced that it was not error to try all of these defendants together on this charge.

It is the general rule that persons who are indicted together should be tried together. *United States v. Michel,* 588 F.2d 986, 1001 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979), *citing United States v. Morrow,* 537 F.2d 120, 136 (5th Cir.1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). Mrs. Chagra does not dispute the propriety under Rule 8(b) of her joinder with the Harrelsons in the indictment. "Therefore, disposition of the various motions to sever under Fed.R.Crim.P. 14 was within the discretion of the trial court." *Id.* at 1001–02. "Denial of a severance will not result in reversal unless the defendant can show that he or she was 'unable to obtain a fair trial without a severance' and can 'demonstrate compelling prejudice against which the trial court [was] unable to afford protection.'" *United States v. Crawford,* 581 F.2d 489, 491 (5th Cir.1978), *quoting United States v. Swanson,* 572 F.2d 523, 528 (5th Cir.), *cert. denied,* 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978).

Mrs. Chagra contends that she suffered compelling prejudice by standing trial with Charles Harrelson because evidence relating only to him, *i.e.,* his prior criminal record, his reputation as a murderer for hire, and, in general, his extraordinarily unsavory character, "spilled over" onto her. Our Circuit's view of such "spill

---

13. **RULE 14. Relief from Prejudicial Joinder**
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trial of counts, grant a severance of defendants or provide whatever other relief justice requires.

In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial. (As amended Feb. 28, 1966, eff. July 1, 1966.)

over" or "cumulation" arguments is set forth in a line of cases beginning with *Morrow:* "The pernicious effect of cumulation ... is best avoided by precise instructions to the jury on the admissibility and proper uses of the evidence introduced by the Government." *Morrow,* 537 F.2d at 136. *Accord, United States v. Loalza-Vasquez,* 735 F.2d 153, 159 (5th Cir.1984) (limiting instructions cured prejudicial effect of similar offense evidence introduced against some defendants); *United States v. Avarello,* 592 F.2d 1339, 1346 n. 10 (5th Cir.), *cert. denied,* 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979) (precise instructions obviated spillover effect); *United States v. Michel,* 588 F.2d at 1002–03 (same).

The bulk of Mrs. Chagra's objections are directed at Charles Harrelson's testimony. Our review of that testimony, which spanned the whole of five days and part of a sixth, shows that Mrs. Chagra requested a limiting instruction on but five occasions. On four of them, her request was granted and the instruction given. The trial court refused to give a limiting instruction only as to a taped conversation between Mr. Harrelson and Joseph Chagra; this conversation had been played previously for the jury without such an instruction. The record as a whole demonstrates a similar willingness on the part of the trial court to give adequate limiting instructions when so requested by defendants.

It appears to be Mrs. Chagra's position that the testimony given by and concerning Mr. Harrelson was so dreadful that its prejudicial effect was incapable of cure by instruction. She has not, however, provid-ed any supporting authority for her position, and we have found none in this Circuit.[14] Absent such authority, and absent specific evidence of "compelling prejudice," we decline to find the trial court's limiting instructions ineffective. Indeed, the circumstance that one has chosen odious associates seems a dubious sword.

 As a second ground of error, Mrs. Chagra contends that the great disparity of evidence offered against her on the one hand and against Mr. Harrelson on the other renders the trial court's denial of her motion to sever reversible error. *Morrow,* and cases devolving therefrom, establish that in this Circuit "[s]everence under Fed.R.Crim.P. 14 is an appropriate remedy for a disparity in the evidence only in the most extreme cases." *Morrow,* 537 F.2d at 137 (footnote omitted). *Accord, United States v. Clark,* 732 F.2d 1536, 1542 n. 18 (11th Cir.1984) (*citing Morrow*); *United States v. Mitchell,* 733 F.2d 327, 331 (4th Cir.1984) (*citing Morrow*); *United States v. Berkowitz,* 662 F.2d 1127, 1135 (5th Cir. 1981). In quantitative terms, the amount of evidence offered against Mrs. Chagra was minimal compared to that offered against Harrelson. This is clearly insufficient in itself to justify severance, *see Berkowitz,* 662 F.2d at 1135 n. 8; a qualitative disparity must be shown as well. Although Mrs. Chagra's claim of qualitative disparity is colorable, and by no means frivolous, we decline to hold that the disparity was so extreme as to necessitate severance of her trial on the charge of conspiracy to obstruct justice.[15]

14. *United States v. Wasson,* 568 F.2d 1214 (5th Cir.1978), is not on point. Defendants in *Wasson* were charged with conspiracy and a substantive offense. The jury convicted one defendant of conspiracy and the substantive offense despite the government's clear statement that it did not believe that defendant to have participated in the conspiracy. The trial court found this to demonstrate confusion and overturned the jury verdict as to the conspiracy charge. It then considered the defendant's conviction of the substantive offense:

> [W]e are not prepared to say that Littrell was not prejudiced. Although the evidence was sufficient to support the verdict on the sub-

stantive count, it was not so overwhelming that the obvious guilt of Kennedy did not tip the scales against Littrell. Therefore, we find the trial court abused its discretion in failing to grant a severance, and we remand this case to the trial court for a new trial.

*Id.* at 1223. The *Wasson* court's finding of prejudice was clearly premised on its prior finding of jury confusion. There is no equivalent indication of jury confusion in this case.

15. In support of our holding, we note the government's argument that no prejudice ensued from Mrs. Chagra's trial with Harrelson because the evidence objected to as prejudicial would have been admissible to show motive,

 In determining whether the trial court erred in refusing to sever Mrs. Chagra's trial from that of Harrelson, "we must balance the public's interest in economy of judicial administration with the possible prejudice to the defendant." *United States v. Lee*, 744 F.2d 1124, 1127 (5th Cir.1984); *accord, United States v. Sudderth*, 681 F.2d 990, 996 (5th Cir.1982). We are convinced that, as to the conspiracy to obstruct justice,[16] the possible prejudice to Mrs. Chagra of being tried with Mr. Harrelson was not so great as to outweigh considerations of judicial economy, both for the reasons discussed above and because that prejudice was reduced by the presence of Mrs. Harrelson as a third defendant against whom evidence was also adduced. We therefore affirm the rulings of the trial court; it was not error to deny Mrs. Chagra's motions for severance.

### *Individual Contentions: Jo Ann Harrelson*

#### A. *Severance*

Jo Ann Harrelson contends that the count of the indictment charging her with conspiracy to obstruct justice was improperly joined under Rule 8, Fed.R.Crim.P.,[17] with counts charging her codefendants with conspiracy to commit murder and first

degree murder. Mrs. Harrelson's contention is without merit.

 The propriety of joinder under Rule 8 is determined by the initial allegations of the indictment, which are accepted as true absent arguments of prosecutorial misconduct. *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); *United States v. Salinas*, 601 F.2d 1279 (5th Cir.1979), modified 610 F.2d 250 (5th Cir.1980); *United States v. Levine*, 546 F.2d 658 (5th Cir.1977). Joinder of the count naming Mrs. Harrelson as defendant to those naming her codefendants was thus proper if the indictment alleged all of them " 'to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses....' Separate conspiracies with different memberships may still be joined if they are part of the same series of acts or transactions." *United States v. Grassi*, 616 F.2d 1295, 1303 (5th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). Whether the counts of an indictment fulfill the "same series" requirement is determined by examining " 'the relatedness of the facts underlying each offense.... [W]hen the facts underlying each offense are so closely connected that proof of such facts is necessary to establish each offense, joinder of defendants and

---

intent, scheme or design had she been tried separately. If accurate, the government's point is well taken. *See United States v. Scott*, 659 F.2d 585, 589 (5th Cir.1981), *cert. denied*, 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 105 (1982); *United States v. Wilson*, 657 F.2d 755, 765–66 (5th Cir.1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982). Mrs. Chagra has not disputed the government's assessment of the admissibility of the evidence in question.

16. Were we required to rule on this point in relation to the charge of conspiracy to commit murder, as to which the disparity of evidence was appreciably greater and in which there was no third defendant to dissipate the effect of evidence offered against Mr. Harrelson, our decision might be otherwise, but because of our remand of that aspect of Mrs. Chagra's case we need not do so.

17. **RULE 8. Joinder of Offenses and of Defendants**

 (a) **Joinder of Offenses.** Two or more offenses may be charged in the same indictment

or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

 (b) **Joinder of Defendants.** Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Subsection (b) of this rule governs Mrs. Harrelson's contention because the case involves multiple defendants and multiple counts. *United States v. Lane*, 735 F.2d 799, 804 (5th Cir.1984).

offenses is proper.' *United States v. Gentile,* 495 F.2d 626, 630 (5th Cir.1974). When there is no 'substantial identity of facts or participants between the two offenses, there is no "series" of facts under Rule 8(b).' " *United States v. Lane,* 735 F.2d 799, 804 (5th Cir.1984), *quoting United States v. Welch,* 656 F.2d 1039, 1049 (5th Cir.1981), *cert. denied, sub nom Cashell v. United States,* 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982). Mrs. Harrelson argues that the requisite "substantial identity" was lacking here because she was named in only one count of the indictment. This argument, ignoring as it does the facts alleged in that indictment, is disingenuous at best [18] and frivolous at worst. Those facts showed Mrs. Harrelson to have been actively involved in a chain of events beginning with the conspiracy to murder Judge Wood and ending with the conspiracy to obstruct the investigation of Judge Wood's murder. It is impossible seriously to contend that these events are unconnected, or that Mrs. Harrelson, who purchased the murder weapon, who provided her daughter as a courier to collect her husband's payment for the murder, and who encouraged her daughter to remain silent during the ensuing investigation into the murder, was unconnected with them. We are entirely unpersuaded [19] that joinder of the count of the indictment naming Mrs. Harrelson with counts naming her codefendants was in any respect inconsistent with the language and intent of Rule 8(b), and accordingly affirm the trial court's denial of her motion for severance under that rule.

Mrs. Harrelson argues in the alternative that the trial court committed reversible error by denying her motion under Rule 14, Fed.R.Crim.P.,[20] for severance from the trial of her husband and Elizabeth Chagra. The trial court's denial of a Rule 14 motion is reviewable only for abuse of discretion; to demonstrate abuse of discretion the appellant must show that he suffered specific and compelling prejudice against which the trial court was unable to afford protection, and that this prejudice resulted in an unfair trial. *United States v. Webster,* 734 F.2d 1048, 1052–53 (5th Cir.1984); *United States v. Hamilton,* 694 F.2d 398, 400 (5th Cir. 1982).

Jo Ann Harrelson has made no effort whatever to bring to our attention evidence of specific prejudice at her trial. *See United States v. Cabellero,* 712 F.2d 126, 132–33 (5th Cir.1983). She does not claim that the trial court failed in even one instance to deliver the proper limiting instruction with regard to evidence offered against another defendant, *see United States v. Thevis,* 665 F.2d 616, 647–48 (5th Cir.), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), nor does she claim that the evidence offered against her was qualitatively different from that offered against her code-

---

**18.** Mrs. Harrelson was not named in Count 1 of the indictment because she had been granted use immunity in connection with her testimony before the grand jury investigating Judge Wood's murder. *See United States v. Harrelson,* 705 F.2d 733, 735 (5th Cir.1983).

**19.** Mrs. Harrelson has brought no case to our attention in which misjoinder was found on facts similar to those presented here, and we have found none; on the contrary, the case law supports joinder in these circumstances. *See, e.g., United States v. Scott,* 659 F.2d 585, 589 (5th Cir.), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 105 (1982) (tax counts properly joined with witness intimidation counts: "Scott's intimidation of Arrowood was an attempt to escape criminal liability for his conduct charged in the tax return counts. As a result, a direct relationship exists between the tax return counts and

the witness intimidation count."); *United States v. Forrest,* 623 F.2d 1107, 1114 (5th Cir.), *cert. denied,* 449 U.S. 924, 101 S.Ct. 327, 66 L.Ed.2d 153 (1980) (perjury charges properly joined with jury tampering charges because both derived from defendant's trial for same substantive offense); *United States v. Quinones,* 516 F.2d 1309, 1312 (1st Cir.), *cert. denied,* 423 U.S. 852, 96 S.Ct. 97, 46 L.Ed.2d 76 (1975) (escape from custody count properly joined with rape and assault counts because defendant's custody "was a direct result of the happenings charged in the other counts for which he was tried"); *compare United States v. Lane,* 735 F.2d 799, 804–06 (5th Cir.1984) (counts improperly joined because no allegation of common scheme or plan; perjury count properly joined to count concerning related offense).

**20.** *See supra* n. 13.

fendants.[21] Instead, Mrs. Harrelson argues on brief that it was error to force her to stand trial with others charged with "heinous" offenses while she herself was charged with only "a much less serious offense." We find this transparent attempt to turn immunity into innocence distasteful.

 Mrs. Harrelson further contends that she was prejudiced by having to stand trial with her husband because of the "spillover" effect on her of evidence regarding his character and past. This argument has a rather different flavor coming from Harrelson's wife than it does from Mrs. Chagra, who met Harrelson for the first time at their arraignment; we very much doubt whether a wife's complaints about her coconspirator husband's character are properly addressed to the trial court, or to us. Moreover, evidence of the reputation or past crimes of a codefendant does not ordinarily justify severance. *See United States v. Howell,* 664 F.2d 101, 106 (5th Cir.1981), *cert. denied,* 455 U.S. 1005, 102 S.Ct. 1641, 71 L.Ed.2d 873 (1982); *United States v. Ocanas,* 628 F.2d 353, 359 (5th Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981); *United States v. Perez,* 489 F.2d 51, 67 (5th Cir.1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974), and cases cited therein. Mrs. Harrelson nonetheless argues, without supporting authority, that her relationship with Harrelson increased the prejudice to her of evidence concerning him. A similar contention was made and rejected in *United States v. Partin,* 552 F.2d 621 (5th Cir.1977), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977):

[Hugh] argues that the case against him was weaker than against his brother, and that the jury might have attributed greater knowledge to him of his brother's actions than in fact was the case, simply because they were brothers.

This argument is untenable.

*Id.* at 641. We find all of Mrs. Harrelson's arguments untenable and wholly without support; she has signally failed to demonstrate the "specific and compelling" prejudice required for severance under Rule 14. We therefore affirm the trial court's denial of her motions for severance under that Rule.

**B. *Letters to Starr***

Jo Ann Harrelson also assigns as error the trial court's refusal to admit into evidence a series of letters written by her to her daughter, Teresa Starr, during Starr's incarceration in the Uvalde County Jail. Starr was jailed for contempt when she refused to testify before the grand jury investigating Judge Wood's murder. At trial, the government introduced portions of some of these letters to corroborate Starr's testimony that Mrs. Harrelson had encouraged Starr's silence. Mrs. Harrelson requested the admission of the whole of each letter of which the government had introduced a part, pursuant to Rule 106, Fed.R.Evid.[22] The trial court granted each such request "in an abundance of precaution," although it expressed doubt as to the relevance of the material so admitted. Mrs. Harrelson then asked that the remaining letters in the entire series written by her to Starr be admitted.[23] She first sought to have the letters introduced as "other writings" under Rule 106; when

---

21. She does contend that the quantitative disparity between evidence offered against her and that offered against her codefendants mandated severance. We have already disposed of this contention as to Mrs. Chagra; quantitative disparity alone is insufficient to justify severance under Rule 14. *See, supra, Morrow, Berkowitz.* Her reliance on *United States v. Sampol,* 636 F.2d 621 (D.C.Cir.1980), is misplaced. The *Sampol* facts are not, as alleged, on all fours with those of the instant case, nor is the law on disparity in the D.C. Circuit that of the Fifth.

22. **RULE 106. Remainder of or Related Writings or Recorded Statements**
 When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

23. The amount of material covered by this request must have been considerable, given that Starr spent more than four months in jail and Harrelson wrote to her almost every day.

this proved unsuccessful, she advanced Rule 803(3)[24] as a basis for their admission. The government opposed this offer and the trial court denied it. Mrs. Harrelson now contends that the denial was reversible error.

 We do not reach the merits of her claim because Mrs. Harrelson made no offer of proof of the contents of the letters in question. Under Rule 103(a)(2), Fed.R. Evid.,

> (a) Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (2) In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

Absent compliance with the dictates of Rule 103, "this circuit will not even consider the propriety of the decision to exclude the evidence at issue." *United States v. Winkle*, 587 F.2d 705, 710 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979); *accord, United States v. Collins*, 690 F.2d 431, 438 (5th Cir.1982), *cert. denied*, 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 801 (1983); *Mills v. Levy*, 537 F.2d 1331, 1333 (5th Cir.1976); *see also United States v. Gonzalez*, 700 F.2d 196, 201–02 (5th Cir.1983).

Under even the most lenient interpretation of Rule 103, we are unable to construe Mrs. Harrelson's statement of the rules thought to apply to this evidence as an offer of proof of its substance. We are therefore precluded from finding error in its exclusion.[25]

## C. *Other Contentions*

 Jo Ann Harrelson's remaining contentions are without merit and we deal with them briefly. Teresa Starr's testimony provided sufficient independent evidence to justify the admission against Mrs. Harrelson of the hearsay declarations of her coconspirators under *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). The evidence adduced at trial, viewed in the light most favorable to the verdict, *United States v. Ocanas*, 628 F.2d 353, 360 (5th Cir.), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981), was sufficient to support Mrs. Harrelson's conviction; there is no doubt that a "reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *affirmed on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

Having rejected each of Mrs. Harrelson's assignments of error, we therefore affirm her conviction.

*Individual Contentions:*
*Charles Harrelson*

*Admission of Testimony of Witnesses Who Had Been Hypnotized*

 Charles Harrelson did not object at trial to the admission of the testimony of two witnesses, Chrys Lambros[26] and Wes-

---

24. **RULE 803. Hearsay Exceptions; Availability of Declarant Immaterial**
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\*　　\*　　\*　　\*　　\*　　\*

(3) **Then existing mental, emotional, or physical condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

25. In any event, it appears to us unlikely, based on our review of the record, that the trial court abused "its broad discretion in determining the admissibility of evidence based on relevance and materiality," *Collins*, 690 F.2d at 438, when it excluded Harrelson's letters. In view of Starr's lengthy cross-examination by Harrelson's counsel on the subject, the letters themselves would probably have been merely cumulative.

26. Lambros, an attorney, lived at the Chateau Dijon townhouses, as did Judge Wood. On the morning of Judge Wood's death, Lambros first

ley Coddington,[27] who had been hypnotized before trial.[28] Harrelson nonetheless contends now that the admission of their testimony was reversible error because it had been hypnotically enhanced.

Harrelson's contention is grounded solely on *United States v. Valdez*, 722 F.2d 1196 (5th Cir.1984); indeed, his argument consists almost entirely of massive quotations from that opinion. In *Valdez*, we considered "only one kind of post-hypnotic testimony: the identification of a person known by the witness to be under suspicion, whom the witness had nonetheless been *unable* to identify before being hypnotized." *Id.* at 1202 (emphasis added). The witness at issue in *Valdez*, Texas Ranger Jackson, interviewed the defendant a number of times without identifying him as the man he had seen at the crime site; before hypnosis, Jackson did not recall ever having seen Valdez prior to their first official meeting. Jackson's post-hypnotic testimony was thus not the same kind as that offered by Lambros and Coddington.

Neither of them demonstrated an inability to identify Harrelson before hypnosis. Coddington came forward only *after* he had identified Harrelson from photographs. Before she was hypnotized, Lambros described the man she had seen. It is true that Lambros did not positively identify Harrelson before she was hypnotized, but it is also true that she did not fail to identify Harrelson before she was hypno-

tized. These facts place the testimony of both Coddington and Lambros beyond the exclusionary rule formulated in *Valdez*. We also note that the procedures utilized in Jackson's hypnosis were found "unduly suggestive" by the *Valdez* court, *id.* at 1203, in contrast to those at issue here, which seem to have been conducted with care and circumspection.

Under Federal Rule of Evidence 103, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." In this Circuit, a conviction will not be reversed "unless an error in admitting evidence is shown to have exerted a substantial impact on the verdict." *Valdez*, 722 F.2d at 1204 and n. 39. In addition to demonstrating that the trial court erred in admitting the testimony of Lambros and Coddington, it was therefore incumbent upon Harrelson to show that their testimony had a substantial impact on the jury's verdict. Harrelson made no such showing.[29] We are convinced that excluding the testimony of Lambros and Coddington would have had little or no effect on the jury's verdict.

Harrelson has thus failed on two counts. First, he has failed to show that *Valdez* required the exclusion of Lambros' and Coddington's testimony, and that admission of that testimony was error. Second, he has failed to show that the trial court's

---

saw and then was shouldered aside by a strange man at Chateau Dijon. When she learned of Judge Wood's murder later that day, she called the FBI and described the man she had seen to an FBI artist; he produced a sketch of the man from her description. Lambros was hypnotized by Dr. Richard Garver in June 1979. In November of that year, Lambros identified Charles Harrelson as the man she had seen from a photograph of a lineup. Shortly thereafter, she identified Harrelson again from an actual lineup. At trial, Lambros testified that Harrelson was the man she saw at Chateau Dijon on the morning of Judge Wood's murder; she also testified that she intentionally avoided all media coverage of the case from the day of the murder through the trial.

**27.** Coddington, a taxi driver, was working at the San Antonio airport the night before Judge

Wood's murder. He picked up a male passenger and delivered him to the Chateau Dijon townhouses, where the passenger met another person. In November 1979, Coddington approached the FBI about this passenger, whom he had identified from photographs of Harrelson published by the media. Coddington was hypnotized by Dr. Garver in January 1981. In March 1982, Coddington identified Harrelson from a photograph as the passenger he took to Chateau Dijon the night of May 28, 1979, and testified to that effect at trial.

**28.** Dr. Garver's hypnotic sessions with Lambros and Coddington were preserved on videotape. The tapes were made available to Harrelson, who played each tape in full to the jury in an effort to impeach Lambros and Coddington.

**29.** He in fact ignored this issue.

error in admitting the testimony, if error there was, had a substantial impact on the verdict in his case. For these reasons, the testimony of these witnesses provides no ground for the reversal of Harrelson's conviction.

We have carefully considered the remaining contentions of these appellants, and we conclude that none of them merits discussion. The convictions of Charles and Jo Ann Harrelson are accordingly affirmed, as is that of Elizabeth Chagra on the charge of conspiracy to obstruct justice. The conviction of Elizabeth Chagra on the charge of conspiracy to commit murder is reversed and her cause is remanded for a new trial.

AFFIRMED in part, REVERSED and REMANDED in part.